# EL AL ISRAEL AIRLINES, LTD. *v.* TSUI YUAN TSENG

No. 97–475.   Argued November 10, 1998—Decided January 12, 1999

156

158

*Diane Westwood Wilson* argued the cause for petitioner. With her on the briefs was *Judith R. Nemsick.*

*Jonathan E. Nuechterlein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Alisa B. Klein, David R. Andrews, David S. Newman, Nancy E. McFadden, Paul M. Geier,* and *Dale C. Andrews.*

*Robert H. Silk* argued the cause and filed briefs for respondent.*

JUSTICE GINSBURG delivered the opinion of the Court.

Plaintiff-respondent Tsui Yuan Tseng was subjected to an intrusive security search at John F. Kennedy International Airport in New York before she boarded an El Al Israel Airlines May 22, 1993 flight to Tel Aviv. Tseng seeks tort damages from El Al for this occurrence. The episode-in-suit, both parties now submit, does not qualify as an "accident" within the meaning of the treaty popularly known as the Warsaw Convention, which governs air carrier liability for "all international transportation."[1] Tseng alleges psychic or psychosomatic injuries, but no "bodily injury," as that term is used in the Convention. Her case presents a question of the Convention's exclusivity: When the Convention allows no recovery for the episode-in-suit, does it correspondingly preclude the passenger from maintaining an action for damages under another source of law, in this case, New York tort law?

The exclusivity question before us has been settled prospectively in a Warsaw Convention protocol (Montreal Protocol No. 4) recently ratified by the Senate.[2] In accord with the protocol, Tseng concedes, a passenger whose injury is not compensable under the Convention (because it entails no "bodily injury" or was not the result of an "accident") will

---

*Briefs of *amici curiae* urging reversal were filed for the Air Transport Association of America by *Warren L. Dean, Jr.*, and *Joseph O. Click*; and for the International Air Transport Association by *Bert W. Rein.*

[1] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T. S. No. 876 (1934), note following 49 U. S. C. § 40105.

[2] Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage By Air, signed at Warsaw on October 12, 1929, as amended by the Protocol Done at the Hague on September 8, 1955 (hereinafter· Montreal Protocol No. 4), reprinted in S. Exec. Rep. No. 105–20, pp. 21–32 (1998).

have no recourse to an alternate remedy. We conclude that the protocol, to which the United States has now subscribed, clarifies, but does not change, the Convention's exclusivity domain. We therefore hold that recovery for a personal injury suffered "on board [an] aircraft or in the course of any of the operations of embarking or disembarking," Art. 17, 49 Stat. 3018, if not allowed under the Convention, is not available at all.

The Court of Appeals for the Second Circuit ruled otherwise. In that court's view, a plaintiff who did not qualify for relief under the Convention could seek relief under local law for an injury sustained in the course of international air travel. 122 F. 3d 99 (1997). We granted certiorari, 523 U. S. 1117 (1998),[3] and now reverse the Second Circuit's judgment. Recourse to local law, we are persuaded, would undermine the uniform regulation of international air carrier liability that the Warsaw Convention was designed to foster.

## I

We have twice reserved decision on the Convention's exclusivity. In *Air France* v. *Saks*, 470 U. S. 392 (1985), we concluded that a passenger's injury was not caused by an "accident" for which the airline could be held accountable under the Convention, but expressed no view whether that passenger could maintain "a state cause of action for negli-

---

[3] Federal Courts of Appeals have divided on the treaty interpretation question at issue. See *Krys* v. *Lufthansa German Airlines*, 119 F. 3d 1515, 1518, n. 8 (CA11 1997) (recognizing the split). In accord with the Second Circuit, the Third Circuit has held that the Warsaw Convention does not preclude passengers, unable to recover for personal injuries under the terms of the Convention, from maintaining actions against air carriers under local law. See *Abramson* v. *Japan Airlines Co.*, 739 F. 2d 130, 134 (1984), cert. denied, 470 U. S. 1059 (1985). In contrast, the Fifth Circuit has held that the Convention creates the exclusive cause of action against international air carriers for personal injuries arising from international air travel. See *Potter* v. *Delta Air Lines, Inc.*, 98 F. 3d 881, 885 (1996).

gence." *Id.*, at 408. In *Eastern Airlines, Inc.* v. *Floyd*, 499
U. S. 530 (1991), we held that mental or psychic injuries un-
accompanied by physical injuries are not compensable under
Article 17 of the Convention, but declined to reach the ques-
tion whether the Convention "provides the exclusive cause
of action for injuries sustained during international air
transportation." *Id.*, at 553. We resolve in this case the
question on which we earlier reserved judgment.

At the outset, we highlight key provisions of the treaty
we are interpreting. Chapter I of the Warsaw Convention,
entitled "SCOPE—DEFINITIONS," declares in Article 1(1) that
the "[C]onvention shall apply to all international transporta-
tion of persons, baggage, or goods performed by aircraft for
hire." 49 Stat. 3014.[4] Chapter III, entitled "LIABILITY OF
THE CARRIER," defines in Articles 17, 18, and 19 the three
kinds of liability for which the Convention provides. Article
17 establishes the conditions of liability for personal injury
to passengers:

> "The carrier shall be liable for damage sustained in
> the event of the death or wounding of a passenger or
> any other bodily injury suffered by a passenger, if the
> accident which caused the damage so sustained took
> place on board the aircraft or in the course of any of the
> operations of embarking or disembarking." 49 Stat.
> 3018.

Article 18 establishes the conditions of liability for damage
to baggage or goods. *Id.*, at 3019.[5] Article 19 establishes

---

[4] Citations in this opinion are to the official English translation of the
Convention. See 49 Stat. 3014–3023. Where relevant, we set out, in ad-
dition, the Convention's governing French text. See 49 Stat. 3000–3009;
*Air France* v. *Saks*, 470 U. S. 392, 397 (1985).

[5] Article 18 provides, in relevant part:
"(1) The carrier shall be liable for damage sustained in the event of the
destruction or loss of, or of damage to, any checked baggage or any goods,
if the occurrence which caused the damage so sustained took place during
the transportation by air." 49 Stat. 3019.

the conditions of liability for damage caused by delay. *Ibid.*[6]
Article 24, referring back to Articles 17, 18, and 19, instructs:

"(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

"(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights." *Id.*, at 3020.[7]

## II

With the key treaty provisions as the backdrop, we next describe the episode-in-suit. On May 22, 1993, Tsui Yuan Tseng arrived at John F. Kennedy International Airport (hereinafter JFK) to board an El Al Israel Airlines flight to Tel Aviv. In conformity with standard El Al preboarding procedures, a security guard questioned Tseng about her destination and travel plans. The guard considered Tseng's responses "illogical," and ranked her as a "high risk" passenger. Tseng was taken to a private security room where her baggage and person were searched for explosives and detonating devices. She was told to remove her shoes, jacket, and sweater, and to lower her blue jeans to mid-

---

[6] Article 19 provides:
"The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods." *Ibid.*

[7] Chapter III of the Convention sets forth a number of other rules governing air carrier liability. Among these, Article 20 relieves a carrier of liability if it has "taken all necessary measures to avoid the damage." *Ibid.* Article 22 sets monetary limits on a carrier's liability for harm to passengers and baggage. See *ibid.* Article 23 invalidates "[a]ny [contract] provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in th[e] [C]onvention." *Id.*, at 3020. Article 25(1) renders the Convention's limits on liability inapplicable if the damage is caused by a carrier's "wilful misconduct." *Ibid.*

hip. A female security guard then searched Tseng's body outside her clothes by hand and with an electronic security wand.

After the search, which lasted 15 minutes, El Al personnel decided that Tseng did not pose a security threat and allowed her to board the flight. Tseng later testified that she "was really sick and very upset" during the flight, that she was "emotionally traumatized and disturbed" during her month-long trip in Israel, and that, upon her return, she underwent medical and psychiatric treatment for the lingering effects of the body search. 122 F. 3d 99, 101 (CA2 1997) (internal quotation marks omitted).

Tseng filed suit against El Al in 1994 in a New York state court of first instance. Her complaint alleged a state-law personal injury claim based on the May 22, 1993 episode at JFK. Tseng's pleading charged, *inter alia*, assault and false imprisonment, but alleged no bodily injury. El Al removed the case to federal court.

The District Court, after a bench trial, dismissed Tseng's personal injury claim. See 919 F. Supp. 155 (SDNY 1996). That claim, the court concluded, was governed by Article 17 of the Warsaw Convention, which creates a cause of action for personal injuries suffered as a result of an "accident . . . in the course of any of the operations of embarking or disembarking," 49 Stat. 3018. See 919 F. Supp., at 157–158. Tseng's claim was not compensable under Article 17, the District Court stated, because Tseng "sustained no bodily injury" as a result of the search, *id.*, at 158, and the Convention does not permit "recovery for psychic or psychosomatic injury unaccompanied by bodily injury," *ibid.* (citing *Floyd,* 499 U. S., at 552). The District Court further concluded that Tseng could not pursue her claim, alternately, under New York tort law; as that court read the Convention, Article 24 shields the carrier from liability for personal injuries not compensable under Article 17. See 919 F. Supp., at 158.

The Court of Appeals reversed in relevant part. See 122 F. 3d 99 (CA2 1997).[8] The Second Circuit concluded first that no "accident" within Article 17's compass had occurred; in the Court of Appeals' view, the Convention drafters did not "ai[m] to impose close to absolute liability" for an individual's "personal reaction" to "routine operating procedures," measures that, although "inconvenien[t] and embarass[ing]," are the "price passengers pay for . . . airline safety." *Id.*, at 103–104.[9] In some tension with that reasoning, the Second

---

[8] The Court of Appeals affirmed, without discussion, the District Court's judgment in favor of Tseng on her claim, under the Warsaw Convention, for damage to her baggage. See 122 F. 3d, at 108. We denied El Al's petition for certiorari regarding that issue. See 523 U. S. 1117 (1998).

[9] An "accident" under Article 17 is "an unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U. S., at 405. That definition, we have cautioned, should "be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Ibid.*

The District Court, "[u]sing the flexible application prescribed by the Supreme Court," concluded that El Al's search of Tseng was an "accident": "[A] routine search, applied erroneously to plaintiff in the course of embarking on the aircraft, is fairly accurately characterized as an accident." 919 F. Supp. 155, 158 (SDNY 1996).

The Court of Appeals disagreed. That court described security searches as "routine" in international air travel, part of a terrorism-prevention effort that is "widely recognized and encouraged in the law," and "the price passengers pay for the degree of airline safety so far afforded them." 122 F. 3d, at 103. The court observed that passengers reasonably should be aware of "routine operating procedures" of the kind El Al conducts daily. *Ibid.* The risk of mistakes, *i. e.*, that innocent persons will be erroneously searched, is "[i]nherent in any effort to detect malefactors," the court explained. *Ibid.* Tseng thus encountered "ordinary events and procedures of air transportation," the court concluded, and not "an unexpected or unusual event." *Id.*, at 104.

It is questionable whether the Court of Appeals "flexibly applied" the definition of "accident" we set forth in *Saks*. Both parties, however, now accept the Court of Appeals' disposition of that issue. In any event, even if El Al's search of Tseng was an "accident," the core question of the Convention's exclusivity would remain. The Convention provides for compensation under Article 17 only when the passenger suffers "death, physical injury, or physical manifestation of injury," *Eastern Airlines,*

Circuit next concluded that the Convention does not shield the very same "routine operating procedures" from assessment under the diverse laws of signatory nations (and, in the case of the United States, States within one Nation) governing assault and false imprisonment.   See *id.*, at 104.

Article 24 of the Convention, the Court of Appeals said, "clearly states that resort to local law is precluded only where the incident is 'covered' by Article 17, meaning where there has been an accident, either on the plane or in the course of embarking or disembarking, which led to death, wounding or other bodily injury." *Id.*, at 104–105. The court found support in the drafting history of the Convention, which it construed to "indicate that national law was intended to provide the passenger's remedy where the Convention did not expressly apply." *Id.*, at 105. The Second Circuit also rejected the argument that allowance of state-law claims when the Convention does not permit recovery would contravene the treaty's goal of uniformity. The court read our decision in *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217 (1996), to "instruct specifically that the Convention expresses no compelling interest in uniformity that would warrant . . . supplanting an otherwise applicable body of law." 122 F. 3d, at 107.

### III

We accept it as given that El Al's search of Tseng was not an "accident" within the meaning of Article 17, for the parties do not place that Court of Appeals conclusion at issue. See *supra*, at 165 and this page, n. 9. We also accept, again only for purposes of this decision, that El Al's actions did not constitute "wilful misconduct"; accordingly, we confront no issue under Article 25 of the Convention, see *supra*, at 163,

---

*Inc.* v. *Floyd*, 499 U. S. 530, 552 (1991), a condition that both the District Court and the Court of Appeals determined Tseng did not meet, see 919 F. Supp., at 158; 122 F. 3d, at 104. The question whether the Convention precludes an action under local law when a passenger's claim fails to satisfy Article 17's conditions for liability does not turn on *which* of those conditions the claim fails to satisfy.

n. 7.[10]   The parties do not dispute that the episode-in-suit occurred in international transportation in the course of embarking.

Our inquiry begins with the text of Article 24, which prescribes the exclusivity of the Convention's provisions for air carrier liability.   "[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Saks*, 470 U. S., at 399.   "Because a treaty ratified by the United States is not only the law of this land, see U. S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history *(travaux préparatoires)* and the postratification understanding of the contracting parties." *Zicherman*, 516 U. S., at 226.

Article 24 provides that "cases covered by article 17"—or in the governing French text, "les cas prévus à l'article 17"[11]—may "only be brought subject to the conditions and

---

[10] In the lower courts, Tseng urged that Article 25 took her case outside the Convention's limits on liability.   Article 25, now altered by Montreal Protocol No. 4, concerned damage caused by "wilful misconduct."   49 Stat. 3020.   On that matter, the District Court found "no evidence and no basis for inferring that [the selection of Tseng to be searched] was anything more than a mistake.   Even if such a mistake can be characterized as misconduct," the District Court added, "there is no basis for inferring that it was wilful."   919 F. Supp., at 158.   The Court of Appeals left the District Court's finding on the absence of "wilful misconduct" undisturbed. See 122 F. 3d, at 104.   Tseng's brief in opposition to certiorari did not cite Article 25.   We agree with the United States, as *amicus curiae*, that Tseng has not preserved any argument putting Article 25 at issue in this Court.   See Brief for United States as *Amicus Curiae* 18, n. 10.

[11] The french text of Article 24 reads:

"(1) Dans les cas prévus aux articles 18 et 19 toute action en responsabilité, à quelque titre que ce soit, ne peut être exercée que dans les conditions et limites prévues par la présente Convention.

"(2) Dans les cas prévus à l'article 17, s'appliquent également les dispositions de l'alinéa précédent, sans préjudice de la détermination des personnes qui ont le droit d'agir et de leurs droits respectifs."   49 Stat. 3006.

Literally translated, "les cas prévus à l'article 17" means "the cases anticipated by Article 17," see The New Cassell's French Dictionary 132,

limits set out in th[e] [C]onvention." 49 Stat. 3020. That prescription is not a model of the clear drafter's art. We recognize that the words lend themselves to divergent interpretation.

In Tseng's view, and in the view of the Court of Appeals, "les cas prévus à l'article 17" means those cases in which a passenger could actually maintain a claim for relief under Article 17. So read, Article 24 would permit any passenger whose personal injury suit did not satisfy the liability conditions of Article 17 to pursue the claim under local law.

In El Al's view, on the other hand, and in the view of the United States as *amicus curiae,* "les cas prévus à l'article 17" refers generically to all personal injury cases stemming from occurrences on board an aircraft or in embarking or disembarking, and simply distinguishes that class of cases (Article 17 cases) from cases involving damaged luggage or goods, or delay (which Articles 18 and 19 address). So read, Article 24 would preclude a passenger from asserting any air transit personal injury claims under local law, including claims that failed to satisfy Article 17's liability conditions, notably, because the injury did not result from an "accident," see *Saks,* 470 U. S., at 405, or because the "accident" did not result in physical injury or physical manifestation of injury, see *Floyd,* 499 U. S., at 552.

Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty. See *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 184–185 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). We conclude that the Govern-

592 (D. Girard ed. 1973), or "the cases provided for by Article 17," see The Oxford-Hachette French Dictionary 645 (M. Corréard & V. Grundy eds. 1994).

ment's construction of Article 24 is most faithful to the Convention's text, purpose, and overall structure.

## A

The cardinal purpose of the Warsaw Convention, we have observed, is to "achiev[e] uniformity of rules governing claims arising from international air transportation." *Floyd,* 499 U. S., at 552; see *Zicherman,* 516 U. S., at 230. The Convention signatories, in the treaty's preamble, specifically "recognized the advantage of regulating in a uniform manner the conditions of . . . the liability of the carrier." 49 Stat. 3014. To provide the desired uniformity, Chapter III of the Convention sets out an array of liability rules which, the treaty declares, "apply to all international transportation of persons, baggage, or goods performed by aircraft." *Ibid.* In that Chapter, the Convention describes and defines the three areas of air carrier liability (personal injuries in Article 17, baggage or goods loss, destruction, or damage in Article 18, and damage occasioned by delay in Article 19), the conditions exempting air carriers from liability (Article 20), the monetary limits of liability (Article 22), and the circumstances in which air carriers may not limit liability (Articles 23 and 25). See *supra,* at 162–163, and n. 7. Given the Convention's comprehensive scheme of liability rules and its textual emphasis on uniformity, we would be hard put to conclude that the delegates at Warsaw meant to subject air carriers to the distinct, nonuniform liability rules of the individual signatory nations.

The Court of Appeals looked to our precedent for guidance on this point, but it misperceived our meaning. It misread our decision in *Zicherman* to say that the Warsaw Convention expresses no compelling interest in uniformity that would warrant preempting an otherwise applicable body of law, here New York tort law. See 122 F. 3d, at 107; *supra,* at 166. *Zicherman* acknowledges that the Convention cen-

trally endeavors "to foster uniformity in the law of international air travel." 516 U. S., at 230. It further recognizes that the Convention addresses the question whether there is airline liability *vel non*. See *id.*, at 231. The *Zicherman* case itself involved auxiliary issues: who may seek recovery in lieu of passengers, and for what harms they may be compensated. See *id.*, at 221, 227. Looking to the Convention's text, negotiating and drafting history, contracting states' postratification understanding of the Convention, and scholarly commentary, the Court in *Zicherman* determined that Warsaw drafters intended to resolve *whether there is liability*, but to leave to domestic law (the local law identified by the forum under its choice-of-law rules or approaches) determination of the compensatory damages available to the suitor. See *id.*, at 231.

A complementary purpose of the Convention is to accommodate or balance the interests of passengers seeking recovery for personal injuries, and the interests of air carriers seeking to limit potential liability. Before the Warsaw accord, injured passengers could file suits for damages, subject only to the limitations of the forum's laws, including the forum's choice-of-law regime. This exposure inhibited the growth of the then-fledgling international airline industry. See *Floyd*, 499 U. S., at 546; Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L. Rev. 497, 499–500 (1967). Many international air carriers at that time endeavored to require passengers, as a condition of air travel, to relieve or reduce the carrier's liability in case of injury. See Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw, Minutes 47 (R. Horner & D. Legrez transls. 1975) (hereinafter Minutes). The Convention drafters designed Articles 17, 22, and 24 of the Convention as a compromise between the interests of air carriers and their customers worldwide. In Article 17 of the Convention, carriers are denied the contractual prerogative to exclude or limit their liability for personal injury. In

Articles 22 and 24, passengers are limited in the amount of damages they may recover, and are restricted in the claims they may pursue by the conditions and limits set out in the Convention.

Construing the Convention, as did the Court of Appeals, to allow passengers to pursue claims under local law when the Convention does not permit recovery could produce several anomalies. Carriers might be exposed to unlimited liability under diverse legal regimes, but would be prevented, under the treaty, from contracting out of such liability. Passengers injured physically in an emergency landing might be subject to the liability caps of the Convention, while those merely traumatized in the same mishap would be free to sue outside of the Convention for potentially unlimited damages. The Court of Appeals' construction of the Convention would encourage artful pleading by plaintiffs seeking to opt out of the Convention's liability scheme when local law promised recovery in excess of that prescribed by the treaty. See *Potter* v. *Delta Air Lines, Inc.*, 98 F. 3d 881, 886 (CA5 1996). Such a reading would scarcely advance the predictability that adherence to the treaty has achieved worldwide.[12]

The Second Circuit feared that if Article 17 were read to exclude relief outside the Convention for Tseng, then a passenger injured by a malfunctioning escalator in the airline's terminal would have no recourse against the airline, even if the airline recklessly disregarded its duty to keep the escalator in proper repair. See 122 F. 3d, at 107. As the United States pointed out in its *amicus curiae* submission, however, the Convention addresses and concerns, only and exclusively,

---

[12] The Court of Appeals recognized that the Convention aimed to "balance the interests of the passenger and the carrier," but concluded that, with the "increasing strength of the airline industry, the balance has properly shifted away from protecting the carrier and toward protecting the passenger." 122 F. 3d, at 107. Postratification adjustments, however, are appropriately made by the treaty's signatories. See S. Exec. Rep. No. 105–20, at 5–6.

the airline's liability for passenger injuries occurring "on board the aircraft or in the course of any of the operations of embarking or disembarking." Art. 17, 49 Stat. 3018; see Brief for United States as *Amicus Curiae* 16. "[T]he Convention's preemptive effect on local law extends no further than the Convention's own substantive scope." *Ibid.* A carrier, therefore, "is indisputably subject to liability under local law for injuries arising outside of that scope: *e. g.,* for passenger injuries occurring before 'any of the operations of embarking'" or disembarking. *Ibid.* (quoting Article 17).

Tseng raises a different concern. She argues that air carriers will escape liability for their intentional torts if passengers are not permitted to pursue personal injury claims outside of the terms of the Convention. See Brief for Respondent 15–16. But we have already cautioned that the definition of "accident" under Article 17 is an "unusual event . . . *external to the passenger*," and that "[t]his definition should be flexibly applied." *Saks,* 470 U. S., at 405 (emphasis added). In *Saks,* the Court concluded that no "accident" occurred because the injury there—a hearing loss—"indisputably result[ed] from *the passenger's own internal reaction* to the usual, normal, and expected operation of the aircraft." *Id.,* at 406 (emphasis added). As we earlier noted, see *supra,* at 165–166, n. 9, Tseng and El Al chose not to pursue in this Court the question whether an "accident" occurred, for an affirmative answer would still leave Tseng unable to recover under the treaty; she sustained no "bodily injury" and could not gain compensation under Article 17 for her solely psychic or psychosomatic injuries.

## B

The drafting history of Article 17 is consistent with our understanding of the preemptive effect of the Convention. The preliminary draft of the Convention submitted to the conference at Warsaw made air carriers liable "in the case of death, wounding, or any other bodily injury suffered by a

traveler." Minutes 264; see *Saks*, 470 U. S., at 401. In the later draft that prescribed what is now Article 17, airline liability was narrowed to encompass only bodily injury caused by an "accident." See Minutes 205. It is improbable that, at the same time the drafters narrowed the conditions of air carrier liability in Article 17, they intended, in Article 24, to permit passengers to skirt those conditions by pursuing claims under local law.[13]

Inspecting the drafting history, the Court of Appeals stressed a proposal made by the Czechoslovak delegation to state in the treaty that, in the absence of a stipulation in the Convention itself, "'the provisions of laws and national rules relative to carriage in each [signatory] State shall apply.'" 122 F. 3d, at 105 (quoting Minutes 176). That proposal was withdrawn upon amendment of the Convention's title to read: "CONVENTION FOR THE UNIFICATION OF *CERTAIN* RULES RELATING TO INTERNATIONAL TRANSPORTATION BY AIR." 49 Stat. 3014 (emphasis added); see 122 F. 3d, at 105. The Second Circuit saw in this history an indication "that national law was intended to provide the passenger's remedy where the Convention did not expressly apply." 122 F. 3d, at 105.

The British House of Lords, in *Sidhu* v. *British Airways plc*, [1997] 1 All E. R. 193, considered the same history, but found it inconclusive. Inclusion of the word "certain" in the Convention's title, the Lords reasoned, accurately indicated that "the [C]onvention is concerned with certain rules only, not with all the rules relating to international carriage by air." *Id.*, at 204. For example, the Convention does not say "anything . . . about the carrier's obligations of insurance, and in particular about compulsory insurance against third party risks." *Ibid.* The Convention, in other words, is "a

---

[13] Sir Alfred Dennis of Great Britain stated at the Warsaw Conference that Article 24 is "a very important stipulation which touches the very substance of the Convention, because [it] excludes recourse to common law." Minutes 213.

partial harmonisation, directed to the particular issues with which it deals," *ibid.*, among them, a carrier's liability to passengers for personal injury. As to those issues, the Lords concluded, "the aim of the [C]onvention is to unify." *Ibid.* Pointing to the overall understanding that the Convention's objective was to "ensure uniformity," *id.*, at 209, the Lords suggested that the Czechoslovak delegation may have meant only to underscore that national law controlled "chapters of law relating to international carriage by air with which the [C]onvention was not attempting to deal." *Ibid.* In light of the Lords' exposition, we are satisfied that the withdrawn Czechoslovak proposal will not bear the weight the Court of Appeals placed on it.

## C

Montreal Protocol No. 4, ratified by the Senate on September 28, 1998,[14] amends Article 24 to read, in relevant part: "In the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention . . . ."[15] Both parties agree that, under the amended Article 24, the

---

[14] See 144 Cong. Rec. S11059 (Sept. 28, 1998). The President signed the instrument of ratification for Montreal Protocol No. 4 on November 5, 1998. The Protocol will enter into force in the United States on March 4, 1999.

[15] Article 24, as amended by Montreal Protocol No. 4, provides:

"1. In the carriage of passengers and baggage, any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention, without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

"2. In the carriage of cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and limits of liability set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights. Such limits of liability constitute maximum limits and may not be exceeded whatever the circumstances which gave rise to the liability." S. Exec. Rep. No. 105–20, at 29.

Convention's preemptive effect is clear: The treaty precludes passengers from bringing actions under local law when they cannot establish air carrier liability under the treaty. Revised Article 24, El Al urges and we agree, merely clarifies, it does not alter, the Convention's rule of exclusivity.

Supporting the position that revised Article 24 provides for preemption not earlier established, Tseng urges that federal preemption of state law is disfavored generally, and particularly when matters of health and safety are at stake. See Brief for Respondent 31–33. See also *post*, at 181 (STEVENS, J., dissenting) ("[A] treaty, like an Act of Congress, should not be construed to preempt state law unless its intent to do so is clear."). Tseng overlooks in this regard that the nation-state, not subdivisions within one nation, is the focus of the Convention and the perspective of our treaty partners. Our home-centered preemption analysis, therefore, should not be applied, mechanically, in construing our international obligations.

Decisions of the courts of other Convention signatories corroborate our understanding of the Convention's preemptive effect. In *Sidhu*, the British House of Lords considered and decided the very question we now face concerning the Convention's exclusivity when a passenger alleges psychological damages, but no physical injury, resulting from an occurrence that is not an "accident" under Article 17. See 1 All E. R., at 201, 207. Reviewing the text, structure, and drafting history of the Convention, the Lords concluded that the Convention was designed to "ensure that, in all questions relating to the carrier's liability, it is the provisions of the [C]onvention which apply and that the passenger does not have access to any other remedies, whether under the common law or otherwise, which may be available within the particular country where he chooses to raise his action." *Ibid.* Courts of other nations bound by the Convention have also recognized the treaty's encompassing preemptive ef-

fect.[16] The "opinions of our sister signatories," we have observed, are "entitled to considerable weight." *Saks*, 470 U. S., at 404 (internal quotation marks omitted). The text, drafting history, and underlying purpose of the Convention, in sum, counsel us to adhere to a view of the treaty's exclusivity shared by our treaty partners.

\*   \*   \*

For the reasons stated, we hold that the Warsaw Convention precludes a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention. Accordingly, we reverse the judgment of the Second Circuit.

*It is so ordered.*

---

[16]See, *e. g., Gal* v. *Northern Mountain Helicopters Inc.*, Dkt. No. 3491834918, 1998 B. C. T. C. Lexis 1351, \*15–\*16 (July 22, 1998) (Hunter, J., in chambers) (reviewing claim for personal injuries sustained during helicopter crash, a judge of the Supreme Court of British Columbia concluded: "The Warsaw Convention remedy pursuant to Article 17 is exclusive . . . . [T]he plaintiff has no claim except for that permitted under the Warsaw Convention."); *Naval-Torres* v. *Northwest Airlines Inc.*, 159 D. L. R. (4th) 67, 73, 77 (1998) (Sharpe, J.) (considering claim of bodily injury from exposure, in flight, to second-hand smoke, a judge of the Ontario Court (General Division) rejected passenger's contention that she "is entitled in law to pursue any common law or statutory claims which exist apart from any claims she may have under the *Convention*," and concluded that "where a claim falls within the reach of the *Convention*, the *Convention* is exhaustive of the rights of the plaintiff"); *Emery Air Freight Corp.* v. *Nerine Nurseries Ltd.*, [1997] 3 N. Z. L. R. 723, 735–736, 737 (concluding that action for damage to goods "must comply with the conditions and limits set out in the [C]onventio[n]," New Zealand Court of Appeal recalled the "general purpose of the [C]onventio[n] . . . to protect carriers operating across international boundaries from the vagaries of local laws and to impose a uniform regime upon them and upon those dealing with them"); *Seagate Technology Int'l* v. *Changi Int'l Airport Servs. Pte Ltd.*, [1997] 3 S. L. R. 1, 9 (considering claim of lost goods, Singapore Court of Appeal noted: Articles 17, 18, and 19 "form the sole foundation of the carrier's liability in respect of loss or damage falling within the scope of those articles. In such cases, the party seeking satisfaction from the carrier need not and, in fact, cannot plead his case in common law or otherwise.").

JUSTICE STEVENS, dissenting.

My disagreement with the Court's holding today has limited practical significance, not just because the issue has been conclusively determined for future cases by the recent amendment to the Warsaw Convention, see *ante*, at 160, 174–175, but also because it affects only a narrow category of past cases. The decision is nevertheless significant because, in the end, it rests on the novel premise that preemption analysis should be applied differently to treaties than to other kinds of federal law, see *ante*, at 175. Because I disagree with that premise, I shall briefly explain why I believe the Court has erred.

I agree with the Court that the drafters of the Convention intended that the treaty largely supplant local law. Article 24 preempts local law in three major categories: (1) personal injury claims arising out of an accident;[1] (2) claims for lost or damaged baggage; and (3) damage occasioned by transportation delays.[2] Those categories surely comprise the

---

[1] As we have already held, Article 17 only covers accidents, which we defined as "an unexpected or unusual event or happening that is external to the passenger." *Air France* v. *Saks*, 470 U. S. 392, 405 (1985). Thus, I believe Article 24(2)'s reference to Article 17 does not include nonaccidents.

As a leading treatise states with regard to Article 17: "If the passenger's lawyer does not want the Convention's limits to be applicable, he must either: a) prove the Convention does not apply because his client was not a passenger in international transportation as defined in Article 1; or b) if the Convention is applicable, that the limits are unavailable because the carrier failed to deliver a ticket as provided by Article 3; or c) the carrier was guilty of wilful misconduct (Article 25) or d) *there was no 'accident'*." L. Goldhirsch, The Warsaw Convention Annotated: A Legal Handbook 55 (1988) (emphasis added).

[2] Article 24 provides:

"(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

"(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights."

bulk of potential disputes between international air carriers and their passengers.

The Convention, however, does not preempt local law in cases arising out of "wilful misconduct." Article 25 expressly provides that a carrier shall not be entitled to avail itself of the provisions of the Convention that "exclude or limit" its liability if its misconduct is willful.[3]  Moreover, the question whether the carrier's wrongful act "is considered to be equivalent to wilful misconduct" is determined by "the law of the court to which the case is submitted." *Ibid.* Accordingly, the vast majority of the potential claims by passengers against international air carriers are either preempted by Article 24 or unequivocally governed by local law under Article 25.

Putting these cases aside, we are left with a narrow sliver of incidents involving personal injury that arise neither from an accident nor willful misconduct.[4]  Although the drafters of the treaty may not have realized that any such cases might arise, our construction of the term "accident" in *Air France* v. *Saks,* 470 U. S. 392, 405 (1985), had the effect of either recognizing or creating this narrow band of cases. Frankly, I am not persuaded that this case belongs in this interstitial niche because I believe it should have been resolved by determining that petitioner's alleged misconduct was either an

---

[3] Article 25 provides:

"(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

"(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment."

[4] Article 18 (damage to goods) and Article 19 (damage occasioned by delay) are not limited to accidents; any liability under local law for damages to goods or for delay is therefore explicitly preempted by Article 24(1).  See *Saks,* 470 U. S., at 398.

accident within the meaning of Article 17, or involved willfulness as a matter of local law. Be that as it may, the parties have insisted that we decide the case on the assumption that it belongs in the sliver about which the treaty is silent.

This case and *Saks* therefore differ from each of the cases that the Court has cited in footnote 16 of its opinion to emphasize the importance of respecting "the treaty's encompassing preemptive effect," as none of those cases involved personal injury resulting from a nonaccident. *Ante*, at 175–176.[5] Given the unique character of this and the few other cases in the sliver, it is clear to me that the central purposes of the Convention will not be affected, whether we treat them like accident cases, which preempt local law, or like willful cases, which do not.

The overriding interest in achieving "'uniformity of rules governing claims arising from international air transportation,'" *ante*, at 169, will be accommodated in the situations

---

[5] See *Gal* v. *Northern Mountain Helicopters Inc.*, Dkt. No. 3491834918, 1998 B. C. T. C. Lexis 1351, *2–*3 (July 22, 1998) (involving a helicopter crash and noting "the plaintiff invoked the Warsaw Convention claiming for injuries and loss arising from the accident"); *Naval-Torres* v. *Northwest Airlines Inc.*, 159 D. L. R. (4th) 67, 74, 76 (1998) (stating that injury resulting from second-hand smoke constitutes an accident and expressly noting but declining to resolve the preemption issue decided today by this Court); *Emery Air Freight Corp.* v. *Nerine Nurseries Ltd.*, [1997] 3 N. Z. L. R. 723, 727, 728 (involving damage to cargo, therefore covered under Article 18, and thus explicitly preempted under Article 24(1)); *Seagate Technology Int'l* v. *Changi Int'l Airport Servs. Pte Ltd.*, [1997] 3 S. L. R. 1, 2 (same).

While the Court is correct in its assertion that the British House of Lords assumed the terrorist attack in *Sidhu* v. *British Airways plc*, [1997] 1 All E. R. 193, was not an accident, see *ante*, at 175, I am puzzled why the Lords came to this conclusion. Courts both in this country and in our sister signatories have frequently found a hijacking to be an accident within the meaning of Article 17. See *Saks*, 470 U. S., at 405; *Ayache* v. *Air-France*, 38 Rev. franç. dr. aérien 450, 451 [1984] (T. G. I. Paris, 1st ch.) (France); *Air-France* v. *Consorts Telchner*, 39 Rev. franç. dr. aérien 232, 240 [1984] (S. Ct. Israel).

explicitly covered by Article 24, regardless of how the Court decides this case. In those circumstances, the Convention's basic tradeoff between the carriers' interest in avoiding unlimited liability and the passengers' interest in obtaining compensation without proving fault will be fully achieved.

On the other hand, the interest in uniformity is disregarded in the category of cases that involve willful misconduct. Under the treaty, a reckless act or omission may constitute willful misconduct. See *Koirala* v. *Thai Airways Int'l, Ltd.*, 126 F. 3d 1205, 1209–1210 (CA9 1997); Goldhirsch, *supra*, n. 1, at 121 (stating that most civil law jurisdictions have found that gross negligence satisfies Article 25). This broad definition increases the number of cases not preempted by the Convention. In these circumstances, the delegates at Warsaw did decide "to subject air carriers to the distinct, nonuniform liability rules of the individual signatory nations." *Ante*, at 169.

Thus, the interest in uniformity would not be significantly impaired if the number of cases not preempted, like those involving willful misconduct, was slightly enlarged to encompass those relatively rare cases in which the injury resulted from neither an accident nor a willful wrong. That the interest in uniformity is accommodated in one category of cases but not the other simply raises, without resolving, the question whether the drafters of the treaty intended to treat personal injury nonaccident cases as though they involved accidents. A plaintiff in such a case, unlike those injured by an accident, receives no benefit from the treaty, and normally should not have a claim that is valid under local law preempted, unless the treaty expressly requires that result.[6]

---

[6] The Convention does require such a result, for example, in the case of accidents resulting in no physical injury. I agree with the Court that, in that case, the victim's remedies under local law are preempted by Article 24. See *Eastern Airlines, Inc.* v. *Floyd*, 499 U. S. 530, 552 (1991). My interpretation does not, therefore, produce the anomaly identified *ante*, at 171. Since I believe that all personal injuries (whether physical or

Everyone agrees that the literal text of the treaty does not preempt claims of personal injury that do not arise out of an accident. It is equally clear that nothing in the drafting history requires that result. On the contrary, the amendment to the title of the Convention made in response to the proposal advanced by the Czechoslovak delegation, see *ante*, at 173, suggests that the parties assumed that local law would apply to all nonaccident cases. I agree with the Court that that inference is not strong enough, in itself, to require that the ambiguity be resolved in the plaintiff's favor. It suffices for me, however, that the history is just as ambiguous as the text. I firmly believe that a treaty, like an Act of Congress, should not be construed to preempt state law unless its intent to do so is clear. See *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485 (1996); *Department of Revenue of Ore.* v. *ACF Industries, Inc.,* 510 U. S. 332, 351 (1994); *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993); *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). For this reason, I respectfully dissent.

---

psychological) arising from accidents are covered by Article 17 and therefore preempted by Article 24(2), the "merely traumatized" plaintiff would not be free to sue outside the Convention.