Rosalyn **PRICE** and Eddie R. **Price**, Plaintiffs,

v.

**KLM–ROYAL DUTCH AIRLINES,** Defendant.

No. CivA 1:99–CV–1133–RWS.

United States District Court, N.D. Georgia, Atlanta Division.

July 24, 2000.

E. Alan Armstrong, Atlanta, Georgia, David I. Katzman, phv, John D. McClune, Schaden, Katzman, Lampert & McClune, Troy, MI, for plaintiff.

William T. Plybon, Alston & Bird, Atlanta, Georgia, John F. Schutty, III, phv, Bartholomew J. Banino, phv, Condon & Forsyth, New York, NY, for defendant.

## ORDER

STORY, District Judge.

Plaintiff Rosalyn Price alleges she suffered personal injuries while on board an international flight when a drink cart struck her knees. Now the Court considers Plaintiff's Motion for Partial Summary Judgment [17–1]. After reviewing the record, considering the briefs of the parties, and hearing oral argument the Court enters the following Order **DENYING** the Motion.

## Factual Background

According to the Complaint, Rosalyn Price was a fare paying passenger on board KLM Flight 572 from Amsterdam, The Netherlands to Atlanta, Georgia, with an intermediate stop in Detroit, Michigan. Price slept in her aisle seat as the plane made its way to the United States. She awoke when a service/food cart struck her, injuring her knees.

## Summary Judgment

A district court shall grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is (1) no genuine issue as to any material fact and (2) the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial judge should not weigh the evidence to determine the truth of the matter but should only determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party is entitled to summary judgment when, after adequate time for discovery, the nonmoving party completely fails to prove an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## Discussion

At issue here is the applicability of international agreements establishing limitations on liability and outlining the circumstances under which these caps do not apply. The Court's ruling on this preliminary issue will frame discovery and clarify the issues left for trial. Resolving this issue requires understanding the relationship between a treaty, private international agreements, and regulatory activity by the Department of Transportation.

### I. The Legal Framework

Our starting point is a treaty, the Warsaw Convention of 1929. The Warsaw Convention, as it is a treaty, is the supreme law of the land. *See* U.S. Const. art. VI; *Butler's Shoe Corp. v. Pan Am. World Airways, Inc.*, 514 F.2d 1283, 1285 (5th Cir.1975).[1] The Warsaw Convention applies "to all international transportation of persons, baggage or goods performed by an aircraft for hire." *Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland October 12, 1929* ("Warsaw Convention"), 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in* note following 49 U.S.C.A. § 40105 (1997). The Warsaw Convention exclusively governs the rights and liabilities in this action. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 119 S.Ct. 662, 675, 142 L.Ed.2d 576 (1999) (holding state law causes of action are preempted by the Convention).

### A. Elements of Liability Under the Warsaw Convention

Article 17 of the Convention provides, in relevant part, that a carrier is

---

**1.** *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of for-

mer Fifth Circuit handed down on or before September 30, 1981).

liable for "damage sustained" as the result of "bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft ..." Warsaw Convention, Art. 17. Accordingly, to establish liability, the Convention essentially requires an accident which causes harm to a passenger.

The Supreme Court has characterized an accident, for Warsaw Convention purposes, as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405–06, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985). Here, the report prepared by KLM indicates a sales trolley struck Price's knees. (Pl's. Statement of Material Facts, Exh. A.) It is beyond dispute that being struck by a sales trolley is an unexpected event which is external to the passenger. Thus, it is an accident. In order to recover, however, at trial Plaintiff must still prove this accident caused her harm.

**B. Limitation of Liability—Warsaw Convention & Montreal Agreement**

Having determined that the event in question was an accident, the next task is to determine which law governs the amount Plaintiff may recover in the event she establishes proximate cause. To do so calls for a look at legal materials which may impact the Court's analysis.

**1. Warsaw Convention**

Article 22(1) of the Warsaw Convention limits the liability of international air carriers to 125,000 francs[2], but also provides that "[n]evertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability." Warsaw Convention, Art. 22(1). In addition, Arti-

cle 20(1) provides a defense for the carrier if it proves it took all necessary measures to avoid the accident.

**2. Montreal Agreement**

Changing economic conditions in the middle of the century lead to dissatisfaction with such a low limit. *See Piamba Cortes v. American Airlines Inc.*, 177 F.3d 1272 (11th Cir.1999). After an unsuccessful attempt to raise the limitation of liability in the Hague Protocol of 1955[3], carriers agreed pursuant to Article 22(1) to enter into special private contractual agreements with all passengers (entered into upon purchase of a ticket) to raise the limitation of liability to $75,000 for all international flights originating, terminating or having a connecting point in the United States. *See* Agreement Relating to Liability of the Warsaw Convention and the Hague Protocol, *approved by* C.A.B. Order No. E–23680, 31 Fed.Reg. 7302, *reprinted at* 49 U.S.C.A. § 1502 note (1976); 14 C.F.R. § 203.4.

The carriers also agreed not to invoke the Article 20(1) defense of having taken all necessary measures to avoid the damage or that it was impossible to take such measures. The damage limitation did not apply, however, if the airline engaged in willful misconduct pursuant to Article 25 of the Convention. The carriers took this action in what became known as the Montreal Agreement.

**C. The IATA Agreements**

Some thirty years later, the carriers revisited the issue of whether the liability limits were too low. Discussions eventually led many international carriers, through the International Air Transport Association ("IATA"), to execute a series of agree-

---

**2.** This is the equivalent of about $8300.

**3.** The Senate refused to ratify the Hague Protocol, and the President did not adhere to it.

*Piamba Cortes v. American Airlines, Inc.*, 177 F.3d at 1281.

ments designed to change the limits on liability which were established by the Warsaw Convention and then altered by the Montreal Agreement.

## 1. The IIA

First, the carriers executed the IATA Intercarrier Agreement on Passenger Liability[4] ("IIA"). The IIA provides as follows:

**WHEREAS:** The Warsaw Convention System is of great benefit to international air transportation.

and

**NOTING THAT:** The Convention's limits of liability, which have not been amended since 1955 are now grossly inadequate in most countries and that international airlines have previously acted together to increase them to benefit passengers:

**The undersigned carriers agree**

1. To take action to waive the limitation of liability on recoverable compensatory damages in Article 22 paragraph 1 of the Warsaw Convention as to claims for death, wounding or other bodily injury of a passenger within the meaning of Article 17 of the Convention, so that recoverable compensatory damages may be determined and awarded by reference to the law of the domicile of the passenger.

2. To reserve all available defences pursuant to the provisions of the Convention: nevertheless, any carrier may waive any defence, including the waiver of any defence up to a specified monetary amount of recoverable compensatory damages, as circumstances may warrant. . . .

IIA; (Pl's. Exh. 1 p. 1A.)

An Explanatory Note accompanies the IIA, and states, in relevant part:

The Intercarrier Agreement is an "umbrella accord"; the precise legal rights and responsibilities of the signatory carriers with respect to passengers will be spelled out in the applicable Conditions of Carriage and tariff filings.

The carriers signatory to the Agreement undertake to waive such limitations of liability as are set out in the Warsaw Convention (1929), The Hague Protocol (1955), the Montreal Agreement of 1966 and/or limits they may have previously agreed to implement or were required by Governments to implement. . . .

Explanatory Note to IIA. (Pl's.Exh. 1, p. 2A.)

## 2. The MIA

The carriers also agreed to take certain steps to implement the IIA. The Agreement on Measures to Implement the IATA Intercarrier Agreement ("MIA") provides, in relevant part:

I. Pursuant to the IATA Intercarrier Agreement of 31 October 1995, the undersigned carriers agree to implement said Agreement by incorporating in their conditions of carriage and tariffs, where necessary, the following:

1. {CARRIER} shall not invoke the limitation of liability in Article 22(1) of the Convention as to any claim for recoverable compensatory damages arising under Article 17 of the Convention.

2. {CARRIER} shall not avail itself of any defence under Article 20(1) of the Convention with respect to that portion of such claim which does not exceed 100,000 SDRs[5] . . .

III. Furthermore, at the option of a carrier, additional provisions may be in-

---

4. KLM was a signatory of this agreement as of July 31, 1996. (Pl's. Mot. for Summ. J., Exh. 1 p. 6A.)

5. SDRs are "special drawing rights" and 100,000 SDRs equals approximately $146,-000.

cluded in its conditions of carriage and tariffs ...

MIA; (Pl's. Exh. 1 p. 4A.)

## II. Whether the IIA or the MIA Displaced the Montreal Agreement

The central dispute at this point in the litigation is whether KLM's having signed these agreements prior to the accident had any effect on the relationship between Mrs. Price and the airline. This action is governed by one of two conflicting regimes. Here is what is at stake. If the IIA and MIA apply, then no limit on liability applies and KLM may not invoke the "all necessary measures" defense for amounts less than 100,000 SDRs. On the other hand, if the Montreal Agreement governs this action then damages are capped at $75,000 and this cap may only be exceeded if KLM engaged in willful misconduct.

Price contends once the Department of Transportation approved the IIA its terms became binding on the airlines which had signed it, and therefore KLM's potential liability in this action is governed by the limits set out in the IIA and MIA, not the Montreal Agreement. KLM, on the other hand, maintains the IIA and the MIA simply indicate the collective intention of the carriers to alter their conditions of carriage and tariffs to reflect the new terms set out in the IIA. KLM further argues that it is only through a change in the conditions of carriage (and tariffs embodying such conditions) that a "special contract" may be formed between a carrier and a passenger under Article 22 of the Warsaw Convention.

A basic understanding of conditions of carriage and tariffs is required before addressing these contentions. The contract between the passenger and the airline is established by the conditions of carriage— as evidenced by the ticket. The United States and Canada also require international carriers to file tariffs which are incorporated in the terms of the ticket and are subject to regulatory approval.

 The Warsaw Convention provides that "by special contract, the carrier and the passenger may agree to a higher limit of liability." Warsaw Convention, Art. 22(1). The plain language of the treaty contemplates a contract between the carrier and the passenger to create a limitation of liability other than the amount in the Convention. As discussed above, the contract between the carrier and the passenger is made up of the ticket and any applicable tariffs which become part of the contract. At the time of Price's travel on KLM, the tariff on file with the DOT provided that the limitation of liability for each passenger was $75,000. (*See* Exh. C to Def's. Resp. to Pl's. Mot. Summ. J.) Accordingly, those terms govern this action and limit Price's potential recovery to $75,000 unless she can prove willful misconduct on the part of KLM.

The conclusion that the relationship between carrier and passenger was not altered by the agreements between carriers is consistent with the Warsaw Convention, the history of the Montreal Agreement, the terms of the IIA and the MIA, and most of the regulatory pronouncements put forth by the DOT.

First, the Convention itself dictates the way its terms may be altered—by special contract between carrier and passenger. *See* Warsaw Convention Art. 22.

Second, the carriers entered into the Agreements with the understanding that the tariffs or conditions of carriage had to be altered in order to change the limits. The IIA expressly provides:

> The undersigned carriers agree to take action to waive the limitation of liability on recoverable compensatory damages in Article 22 paragraph 1 of the Warsaw Convention.

IIA. The IIA by its very terms anticipates that the carriers will "take action to waive" the limitation on liability. Thus, the IIA, by itself, is not a special contract between carrier and passenger which could operate to alter the limits set out in the Warsaw Convention. This is true because it merely is an agreement between carriers to take action to change the limits on liability. The Explanatory Note to the IIA makes it clear that this "action" is a change in the conditions of carriage or tariffs:

> The Intercarrier Agreement is an "umbrella accord"; *the precise legal rights and responsibilities of the signatory carriers with respect to passengers will be spelled out in the applicable Conditions of Carriage and tariff filings.*

Explanatory Note to the IIA (emphasis added).

Having concluded the IIA is not a "special contract", the next question is whether the MIA is a "special contract" which trumps the tariff on file at the time of this accident. The MIA provides:

> Pursuant to the [IIA], the undersigned carriers agree to implement said Agreement *by incorporating in their conditions of carriage and tariffs, where necessary, the following:*

MIA, Pl's.Exh. 1. It is clear that the carriers crafted the MIA based on the idea that any change in the rights and responsibilities of the carriers must be made through a change in the conditions of carriage or tariffs. This is the assumption on which both agreements are premised, and this assumption is correct.

Third, the implementation of the Montreal Agreement indicates any changes in the limitation of liability must be the product of a change in the condition of carriage or tariffs. As one court explained:

> [T]he world's major airlines, virtually without exception, signed what became known as the Montreal Agreement.

Under the terms of this agreement, each airline filed a special contract with the Civil Aeronautics Board raising the liability limit to $75,000 on all flights to, from, or stopping over in the United States.

*Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 36 (2nd Cir.1975). Other cases lend further support to the idea that the Montreal Agreement became operative only when the airlines altered their conditions of carriage and/or filed tariffs containing different terms. In *Husserl v. Swiss Air Transport Co., Ltd.,* the court described the implementation of the Montreal Agreement:

> [The] arrangement, known as Agreement CAB 18900, provides, inter alia, that the parties thereto (including the defendant and the majority of domestic and international air carriers) agree to include in their tariffs to be filed with the CAB a "special contract" by which the carrier would waive its defenses provided by Article 20(1) of the Convention and also its limitation of liability under the Convention up to $75,000, The CAB Order Approving Agreement is to be found in 31 Fed.Reg. 7302 (1966).

> Together, the Agreement (signed by each airline), the requisite tariff, filed pursuant to the Agreement on May 16, 1966, the Notice to Passengers included within the ticket informing the passenger of the change in the regime of the Warsaw Convention (and of its applicability), and the CAB order, constitute what has been called the "Montreal Agreement", since these documents were initially presented at a conference in Montreal prompted by the United States denunciation of the Convention. L. Kreindler, 1 Aviation Accident Law, supra, §§ 12A.01–12A.07. It should be emphasized that "[t]he Montreal system has not changed the text of either the Warsaw Convention or the Hague Protocol", but rather "... impose[s] upon

international aviation involving the United States a quasi-legal and largely experimental system of liability that is essentially contractual in nature." *Id.*, at 12A–2.

*Husserl v. Swiss Air Transport Co., Ltd.*, 351 F.Supp. 702, 704 n. 1 (S.D.N.Y.1972). The filing of the tariffs (approved by the DOT) marked the change in the relationship between the carriers and their passengers.

These cases illustrate the Montreal Agreement could not be implemented without changes in the conditions of carriage or tariffs; the same is true for the IIA. This is so because the Warsaw Convention provides its limits may be altered only by special contract between carrier and passenger and that contract consists of the conditions of carriage and any applicable tariffs. Agreements between airlines, by themselves, do not alter the relationship between carrier and passenger.

Finally, the DOT's treatment of the IIA and the MIA further supports this conclusion. In its Order of November 12, 1996, the DOT granted approval of, and antitrust immunity with respect to the IIA and MIA, subject to certain conditions. DOT Order 96–11–6, 1996 WL 656334 (Nov. 12, 1996). In so doing, the DOT stated, "By limiting our conditions to those clearly contemplated by the IATA, we leave no basis for the carriers to withhold immediate implementation of the Agreements proposed." *Id.* at *4. That the carriers possessed the power to withhold immediate implementation of the Agreements suggests the DOT recognized further action on the part of the carriers was required before the changes in liability limits became effective.

In contending the IIA and MIA changed the limitation on liability, Price points to footnote 13 of the November 1996 Order in which the DOT stated:

> We do not consider that a tariff is necessary to implement the waiver of all numerical passenger limits of liability under the Convention. The Agreements speak for themselves, and are thus self-executing under the exemption we are providing.

*Id.* at *5. This comment does not change the Court's conclusion that the Montreal Agreement governs this action. First, the Explanatory Note to the IIA states that the agreement is an umbrella accord and that the precise rights and responsibilities of the signatory carriers will be spelled out in the conditions of carriage and tariffs. (Pl's.Exh. 1 at 2A) Second, in the MIA the carriers "agree to implement [the IIA] by incorporating in their conditions of carriage and tariffs, where necessary," provisions promising not to invoke the limitation of liability in Article 22(1) of the Convention. (Pl's.Exh.1 at 4A.) It is difficult to understand how in the face of direct language contemplating modifying conditions of carriage and filing tariffs the agreements could be self-executing.

Even accepting, for the sake of argument, that the IIA waived the limitation of liability set out in the Warsaw Convention in its entirety, the carrier's duly filed tariff embodying the Montreal Agreement would remain intact. Adherence by carriers to the Montreal Agreement (Agreement 18900) is required by law, and neither the IIA, the MIA, nor the November 1996 Order did anything to displace that requirement. One relevant regulation provides:

> It shall be a condition on the authority of all direct U.S. and foreign carriers to operate in air transportation that they have and maintain in effect and on file with the Department a signed counterpart of Agreement 18900, and a tariff (for those carriers otherwise generally required to file tariffs) that includes its provisions, as required by this subpart. Notwithstanding any failure to file that counterpart and such tariff, any such air carrier or foreign air carrier issued li-

cense authority (including exemptions) by the Department or operating in air transportation shall be deemed to have agreed to the provisions of Agreement 18900 as fully as if that air carrier or foreign air carrier had in fact filed a properly executed counterpart to that Agreement and tariff.

14 C.F.R. § 203.5 (2000); *see also* 14 C.F.R. § 203.4 (2000) ("[C]arriers . . . shall file with the Department's Tariffs Division a tariff that includes [the Montreal Agreement.]") .

In its Order of January 8, 1997, the DOT decided it would accept tariffs implementing the MIA. By that Order it also addressed the relationship between the MIA and the Montreal Agreement in a section which deserves a close look:

> IATA also requests that we permit the MIA Agreement, conforming to the revised conditions, to be implemented through tariff filings, and that carriers so adhering to that Agreement *be permitted to have it replace the 1966 Montreal Interim Agreement,* and be exempted from regulations mandating adherence to the 1966 Agreement. IATA argues that implementation through tariffs provides all parties or litigants with certainty as to the content of the applicable waivers, and will prevent needless litigation over the lack of such clarity.
>
> *We have decided to accept tariffs for the implementation of the MIA* Agreement provided that those tariffs contain only the so called mandatory provisions of the MIA (i.e., waiver of the limits in their entirety, and strict liability up to 100,000 SDRs—Section I of the MIA Agreement), in the precise language of the MIA.

DOT Order 97–1–2, 1997 WL 4834 (January 8, 1997) at *4 (emphasis added).

Thus, the DOT decided to accept tariffs which incorporated mandatory provisions

of the MIA in the "precise language of the MIA." This is exactly what the express terms of the MIA anticipated. MIA ("[T]he undersigned carriers agree to implement [the IIA] by incorporating in their conditions of carriage and tariffs, where necessary, [the mandatory provisions of the MIA]").

Having set out the manner in which tariffs implementing the language of the MIA may be filed and accepted, the Department then turned to the issue of substituting the new agreements for the Montreal Agreement for purposes of Department regulations:

> Finally, we recognize the desirability of substituting these Agreements, with the waiver of the Warsaw liability limits in their entirety, and application of strict liability up to 100,000 SDRs, for the 1966 Montreal interim agreement provisions which waive liability limits only up to $75,000. We will therefore provide, that to the extent that, and only for so long as, a carrier is a party to one of the two agreements (the IPA or the MIA Agreements) *in the manner specified herein,* the applicable agreement will be considered to be substituted for the 1966 Montreal interim agreement for the purposes of all DOT regulations and authority conditions requiring participation in the 1966 Agreement, . . . .

*Id.* at *4–5. (emphasis added) The "manner specified herein" is the filing and acceptance of tariffs containing the "precise language of the MIA."

This conclusion gains further support from the DOT's Order 98–8–28 which explains the Department's January 1997 Order as having:

> provided for substitution of the MIA or IPA Agreements for the 1966 Montreal Interim Agreements in all DOT regulations and authority conditions for carriers implementing either of those Agreements in accordance with tariffs filed

with the Department and meeting the requirements of that Order.

DOT Order 98–8–28, 1998 WL 527097 (August 28, 1998) at *1. The essence of the January 1997 Order is that a carrier which has filed an amended tariff containing the precise language of the MIA would be deemed in compliance with regulations requiring participation in the Montreal Agreement.

The DOT could have very easily stated that all carriers which had signed the IIA and the MIA were deemed to have filed tariffs containing the mandatory provisions of the MIA. It did not. Instead, the DOT concluded it would "accept tariffs" containing the mandatory provisions of the MIA. There is an important difference between these two approaches for accepting tariffs presupposes action on the part of the carriers which KLM had not taken at the time of this accident.

At the time of the accident, KLM's tariff contained the terms of the Montreal Agreements. This action is governed by that agreement, and accordingly, Price's damages are limited to $75,000 unless she can prove willful misconduct on the part of KLM.

III. *In re Air Crash at Agana, Guam*

Plaintiff directs the Court's attention to a recent decision issued in a Multi District Litigation proceeding involving an airline crash in Guam. In that case, the Court ruled the carrier, Korean Airlines (KAL) had waived the Warsaw convention defenses and limits. *In re Air Crash at Agana, Guam,* Oct. 19, 1998, MDL 1237; CV97–7023 HLH (C.D.Cal.).

Without citing a single case, the court ruled that the IATA agreements became effective immediately upon approval by the United States and the European Commission. According to the court, "In the IATA agreements, the international carri-

ers (including KAL) used the technique of "waiving" defenses subject to "requisite government approval." " *Id.*

The problem with this analysis is that the carriers did not expressly waive anything in either the IIA or the MIA. As discussed above, in the IIA the carriers agreed "to take action to waive the limitation of liability." In the MIA that action is more fully explained, "Pursuant to the [IIA], the undersigned carriers agree to implement said Agreement by incorporating in their conditions of carriage and tariffs, where necessary, ..." provisions promising not to invoke some of the protections afforded the carriers by the Convention. MIA.

Even assuming the airlines waived the Warsaw Convention liability limitation protection, this action by international carriers did not displace KLM's duly filed and approved tariff which embodied the terms of the Montreal Agreement. At the time of the accident, DOT regulations required participation in the Montreal Agreement, and this requirement was only excused for carriers which had filed tariffs containing the precise language of the MIA. As KLM had not filed a tariff containing the mandatory provisions of the MIA at the time of the accident, the Montreal Agreement (as required by law) governs this action.

In her reply Plaintiff contends the MIA is the "action" which made the IIA effective and asserts that the MIA provides:

> I. Pursuant to the IATA[, IIA,] and the [MIA] each of the undersigned carriers ("the carrier") *shall, on or before November 1, 1996, include the following in its terms or conditions of carriage, including tariffs embodying conditions of carriage filed by it with any government ...*

(Pl's. Reply p. 8) (emphasis in Plaintiff's brief). This language does not support Plaintiff's position because the language

comes from an agreement to which KLM is not a party. The above-quoted language is from the Air Transport Associations' "Provisions Implementing the IATA Intercarrier Agreement to Be Included in Conditions of Carriage and Tariffs" ("IPA"). (Pl's Exh. 1) In support of her Motion for Partial Summary Judgment Plaintiff correctly pointed out that the "IPA agreement is inapplicable to this case because it does not involve a U.S. carrier." (Pl's.Mot. Summ.J. p. 7 n. 11) Accordingly, the IPA has no bearing on this case.[6]

### Conclusion

For the reasons set out above, Plaintiff's Motion for Partial Summary Judgment [17-1] is **DENIED.** Plaintiffs cause of action is governed by the Montreal Agreement and accordingly her damages are limited to $75,000 unless she can prove willful misconduct on the part of KLM.

---

**6.** The Court is troubled that Plaintiff's counsel would cite this passage to the court while incorrectly claiming it is the MIA and placing emphasis on language suggesting a mandatory date for a carrier to have changed its conditions of carriage or tariffs.