**Monica PEMBERTON, Plaintiff,**

v.

**EXECUTIVE AIRLINES, INC., a foreign corporation, Defendant.**

**Case No. 08–21888–CIV.**

United States District Court, S.D. Florida.

June 18, 2009.

Ricardo M. Martinez–Cid, Podhurst Orseck Josefsberg et al, Miami, FL, for Plaintiff.

Emmet Jay Schwartzman, Carlton Fields, Miami, FL, for Defendant.

## OMNIBUS ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (D.E. 27) AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT (D.E. 31)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendant Executive Airlines' Motion for Partial Summary Judgment to Limit Liability to $75,000.00 (Executive Airlines' Motion, D.E. 27), filed on December 17, 2008, and Plaintiff Monica Pemberton's Cross–Motion for Partial Summary Judgment ("Plaintiff's Motion," D.E. 31), filed on January 20, 2009. Plaintiff filed a response to Executive Airlines' Motion (D.E. 31) on January 20, 2009, and Executive Airlines filed a reply in support of its Motion (D.E. 39) on February 5, 2009. Executive Airlines filed a response to Plaintiff's Motion (D.E. 38) on February 5, 2009, and Plaintiff filed a reply in support of her Motion (D.E. 40) on February 17, 2009. Having considered the Motions, the related papers, and the record, the Court finds as follows.

### I. Background

Plaintiff Monica Pemberton ("Plaintiff") was a passenger on a flight operated by Defendant Executive Airlines ("Executive Airlines") traveling from Vance Amory Airport, New Castle, Nevis Island to San Juan, Puerto Rico. During the flight, Plaintiff was injured. Plaintiff filed a Complaint against American Airlines on July 2, 2008. (*See* D.E. 1.) On November 4, 2008, Plaintiff filed an Amended Complaint substituting Executive Airlines for American Airlines as the defendant. (*See* D.E. 23.)

## II. The Liability Scheme for International Air Carriage

### A. The Warsaw Convention and the Montreal Agreement

The Warsaw Convention is an international treaty governing the liability of air carriers engaged in the international transportation of passengers and cargo. According to Article 1 of the Warsaw Convention, it applies to "all international carriage of persons, luggage or goods performed by aircraft" where "the place of departure and the place of destination, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another Power, even though that Power is not a party to the Convention." The United States and the Federation of St. Kitts and Nevis are contracting parties to the Warsaw Convention.

The Warsaw Convention creates a presumption of air carrier liability, but, in turn, provides some limitations. Article 22(1) of the Warsaw Convention provides:

In the carriage of passengers the liability of the carrier for each passenger is limited to the sum of 125,000 francs [approximately $8300.00]. Where, in accordance with the law of the Court seised of the case, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

The operative version of Article 25 of the Warsaw Convention[1] provides that, under certain circumstances, the liability limitations of Article 22(1) do not apply:

1. The carrier shall not be entitled to avail himself of the provisions of this Convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the Court seised of the case, is considered to be equivalent to wilful misconduct.

2. Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused as aforesaid by any agent of the carrier acting within the scope of his employment.

The Warsaw Convention was supplemented in 1966 by The Agreement Relating to Liability Limitation of the Warsaw Convention and the Hague Protocol (the "Montreal Agreement"). The Montreal Agreement increased the Warsaw Convention's limit on liability for personal injury to $75,000.00 for each individual claimant. The parties agree that the Warsaw Convention, as supplemented by the Montreal Agreement, is applicable to the Plaintiff's claims against Executive Airlines.

### B. The IATA Agreements

Roughly thirty years after the Montreal Agreement, the carriers revisited the issue of whether the liability limits were too low. Discussions eventually led many international carriers, through the International Air Transport Association ("IATA"),[2] to

---

1. Plaintiff and Executive Airlines cite to different versions of Article 25 in their briefs. It appears that Plaintiff cites to the version that was amended by Additional Protocol No. 4 to Amend Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929, as Amended by the Protocol done at The Hague on 28 September 1955, Signed at Montreal on 25 September 1975 ("Montreal Protocol No. 4"). St. Kitts and Nevis, Plaintiff's departure country, was not a signatory to Montreal Protocol No. 4. Accordingly, the Court cites to the unamended version of Article 25 from the original Warsaw Convention from 1929.

2. IATA is a private organization whose membership is comprised of international air carriers and whose purpose is to "promote safe,

execute a series of agreements designed to change the limits on liability which were established by the Warsaw Convention and then altered by the Montreal Agreement. Two of the agreements, the IATA Intercarrier Agreement on Passenger Liability (generally known as "IIA") and the Agreement on Measures to Implement the IATA Intercarrier Agreement (generally known as the "IATA Implementation Agreement"), increased the limit of liability under the Warsaw Convention for personal injury damages up to 100,000 Special Drawing Rights.[3]

The IIA Umbrella Accord is an inter-airline agreement that finds its basis in Article 22(1) of the Warsaw Convention and does not need governmental approval for enforcement. The Umbrella Accord provides the following:

(a) that the signatory carriers agree to take action to waive all liability limitations on recoverable compensatory damages in Article 22(1) of Warsaw, so that recovery may be determined and awarded by reference to the law of the domicile of the passenger;

(b) that the carriers are entitled to all available defenses under Warsaw (i.e., Article 20(1) and Article 21), but may waive such defenses, including the waiver of any defense up to a specified monetary amount;

(c) that carriers reserve the right to seek indemnification or contribution from other responsible parties; and

(d) that participating carriers will urge non-participating carriers to adopt the provisions of the Umbrella Accord.

(*See* D.E. 31–6 at 2.)

In an Explanatory Note, the IIA provides that "the precise legal rights and responsibilities of the signatory carriers with respect to passengers will be spelled out in the applicable Conditions fo Carriage and tariff filings." (*See* D.E. 31–6 at 1.)

The IATA Implementation Agreement is intended to implement the Umbrella Accord by having signatory carriers incorporate into their conditions of carriage and tariffs the following:

(a) waiver of Warsaw's Article 22(1) liability limitation as to any compensatory damages under Article 17 of Warsaw;

(b) a waiver providing for strict liability with respect to any claim under Article 17 which does not exceed 100,000 SDRs unless, at the option of the carrier, the 100,000 is raised for some routes, if authorized by the government to which the routes pertain;

(c) at the option of the carrier, the carrier agrees that compensatory damages may be determined by the law of the domicile or permanent residence of the passenger; and

(d) neither the waiver of the limits nor the waiver of the defenses shall be applicable to claims made by public social insurance or similar bodies.

(D.E. 31–7 at 1.)

### III. Plaintiff's Motion

■ Plaintiff contends that she is entitled to a partial summary judgment finding that Executive Airlines is bound by the IIA because American Airlines, Inc. ("American Airlines"), a signatory to the IIA, acted as the agent for Executive Airlines in the sale of the ticket for the subject flight. The Court disagrees.

■ Pursuant to the plain language of Article 22(1), in order to waive the liability limitations of the Warsaw Convention,

---

regular, and economic air transport." *See generally* www.iata.org.

**3.** The Special Drawing Right ("SDR") is a fluctuating international reserve asset created by the International Monetary Fund.

there must be a contract between the carrier and the passenger so stipulating. The contract between the carrier and the passenger is made up of the ticket and any applicable tariffs which become part of the contract. *See Price v. KLM–Royal Dutch Airlines*, 107 F.Supp.2d 1365, 1370 (N.D.Ga.2000). The IATA Implementation Agreement expressly provides that signatories to the IIA must implement the IIA's waiver of limitation on liability *by incorporating in their conditions of carriage and tariffs* the terms of the IIA. (D.E. 31–7.)

Plaintiff's argument is that American Airlines was acting as Executive Airlines's agent in the sale of the plane ticket to Plaintiff and, therefore, the contractual obligations of American Airlines under the IIA and the IATA Implementation Agreement should be imputed to Executive Airlines. In support of her claim that there was a principal-agency between American Airlines and Executive Airlines, Plaintiff offers the following undisputed facts: Plaintiff purchased her ticket for the sub-

ject flight online through American Airlines, Inc.'s website, www.aa.com (D.E. 31 at 3); the internet reservation summary stated that the flight would be operated by American Eagle/Executive [4] (*id.*); when Plaintiff arrived at the airport for her scheduled flight, she checked in at the American Airlines' check-in desk (*id.*); the code of the flight was AA 5089 and the boarding pass indicated that the flight was operated by American Eagle (*see* D.E. 31–4); the American Eagle logo was displayed on the outside of the plane and it was Plaintiff's understanding that American Eagle is a part of American Airlines (D.E. 31 at 4); and American Airlines issued multiple checks to Plaintiff for the purpose of reimbursing her for a portion of her medical costs (*id.* at 5).

The Court declines to bind Executive Airlines to the IIA. First of all, even if American Airlines was acting as Executive Airlines' agent for the sale of Plaintiff's ticket [5], the Court cannot determine why this agency relationship would result in Executive Airlines being bound by the

---

**4.** Plaintiff also contended in her Statement of Undisputed Facts that American Airlines was the carrier on the subject flight, although Plaintiff appears to have backed off of that claim.

**5.** An additional problem with Plaintiff's argument is that she appears unclear regarding which airline was acting as the agent and which airline was the principal. For example, Plaintiff contends that she bought her ticket at the American Airlines website and checked in at the American Airlines check-in desk. She also alleges that the boarding pass indicated that the flight was operated by American Eagle, that the outside of the plane had an American Eagle logo, and that it was her understanding that American Eagle was a part of American Airlines. In fact, American Airlines, Inc. is a subsidiary of AMR Corporation. AMR Eagle Holding Corporation is also a subsidiary of AMR Corporation. AMR Eagle Holding Corporation owns two regional airlines which do business as "American Ea-

gle"—American Eagle Airlines, Inc. and Executive Airlines. *See* AMR Corporation, Annual Report (Form 10–K), at 4 (Feb. 18, 2009).

Plaintiff's attempt to establish an agency-principal relationship between American Airlines and Executive Airlines blurs this basic corporate structure of the AMR Corporation. That is, at various times in her argument, American Eagle is acting as American Airlines' agent (when it is operating planes for American Airlines), American Airlines is acting as an agent for Executive Airlines (when its website is used to book flights operated by Executive Airlines) and American Eagle is acting as an agent for Executive Airlines (when it was listed as the carrier on Plaintiff's boarding pass). As such, even if the Court were to find that one airline's status as a signatory to the IIA could be imputed to another, it is unclear which airline's signatory status—American Airlines', American Eagle Airlines, Inc.'s, or Executive Airlines'—should be imputed to the other in this case.

terms of the IIA. As discussed above, the IIA is an inter-carrier agreement that subjects the signatory carriers to higher limits of liability than those provided for in the Warsaw Convention. American Airlines signed this agreement in 1996, over ten years before Plaintiff booked her flight. Plaintiff has not alleged that Executive Airlines ratified American Airlines' entry into the IIA. Further, Plaintiff has presented no authority, case law or otherwise, to support its position that Executive Airlines should be bound by American Airlines' signatory status. Second, pursuant to the Warsaw Convention and the IATA Implementation Agreement, the waiver of the liability limitation must be accomplished through a contract between the carrier and the passenger. Plaintiff has presented no evidence of a contract (e.g., her passenger ticket) between her and Executive Airlines in which Executive Airlines agreed to waive the Warsaw Convention's liability limitations. As Executive Airlines points out in its Response, Plaintiff's argument opens the proverbial can of worms:

> For example, if Executive somehow is deemed to be an [IIA] signatory in this case, does that mean Executive waives the Warsaw Convention's limitation of liability for every Executive passenger— or just this particular plaintiff? Does Plaintiff suggest that all code-share carriers are subject to the same treatment, regardless of whether they ever signed the IATA agreements? How does she propose to make such a distinction? Is it her position that a passenger can avoid the Warsaw Convention's $75,000.00 cap if he/she simply presents some evidence that the carrier that did not sign the IATA agreements has some affiliation with a carrier that did sign the agreements?

(D.E. 38 at 8.) The Court is unwilling to open the door to these kinds of difficult questions that could have vast unintended consequences on a complicated international public-private liability scheme.

Accordingly, Plaintiff's Cross–Motion for Summary Judgement is **DENIED.**

## IV. Executive Airlines' Motion

■ Defendant contends that it is to a partial summary judgment finding that Plaintiff's liability is capped at $75,000 because Plaintiff has not adduced facts suggesting that the Warsaw Convention's liability limitation should be abrogated. As noted above, the parties agree that the Warsaw Convention, as supplemented by the Montreal Agreement, are applicable to the Plaintiff's claims against Executive Airlines. Executive Airlines argues in its Motion that, because Plaintiff cannot demonstrate willful misconduct, Article 25 of the Warsaw Convention is inapplicable, and Plaintiff's damages are capped at $75,000. Plaintiff has the burden of proving willful misconduct. *See Floyd v. Eastern Airlines,* 872 F.2d 1462, 1489 (11th Cir.1989).

Plaintiff alleges in her Amended Complaint that her accident was the result of Executive Airlines' negligence. (*See* D.E. 23 at 3.) There is nothing in the Amended Complaint remotely approaching an allegation of willful misconduct by Executive Airlines. However, Plaintiff contends that discovery in this case is still outstanding and therefore it is premature to determine whether she can satisfy her burden of proving willful misconduct. The Court finds that, while the record is without evidence of willful misconduct, it is still too early to rule on Executive Airlines' Motion. Accordingly, Executive Airlines' Motion is **DENIED without prejudice.** Executive Airlines may refile its motion at the close of discovery.

Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that:

1. Executive Airlines' Motion for Partial Summary Judgement (D.E. 27) is **DENIED**.

2. Plaintiff's Cross–Motion for Partial Summary Judgment (D.E. 31) is **DENIED**.