Opinion by Chief Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge OTERO.
*862 OPINION
KOZINSKI, Chief Judge:
We consider when airlines may be held liable to passengers on international flights whom they force to disembark before the voyage is completed.
Facts
These are the facts as plaintiffs allege them: On September 29, 2003, a group of Egyptian businessmen, their wives and a Brazilian fiancée, boarded Alaska Airlines Flight 694 in Vancouver, British Columbia. Their journey had started a few days earlier in Cairo and they were headed for a convention on energy-related products and services in Las Vegas. The Egyptians were interested in becoming distributors of natural gas equipment manufactured by a Texas company and, to that end, had scheduled a meeting with officials of that company who were attending the convention.
The nine plaintiffs took up all but three of the first class seats on Flight 694. A tenth passenger was Kimberlie Shealy, an American; she sat next to plaintiff Magdy Rasikh, whom she described as “[a]n Egyptian gentleman” with whom she “was having a pleasant conversation.” Shealy Declaration at ¶¶ 2, 5. According to Shealy, who provides the only independent account of the incident, the flight attendants treated the Egyptians badly. It started “[e]arly in the flight” when Shealy “heard some comment by the young man in row one [plaintiff Amre Ginena] about coach passengers using the first class bathroom to a young blonde flight attendant [apparently Dalee Callaway], She said something in response but I could see by her face that she did not like the question. I was surprised by her obvious reaction....” Id. at ¶ 4.
About an hour into the flight, Reda Ginena, who was in the front row with his wife and son, stood up to stretch. Shortly thereafter, a second flight attendant, Lee Anne Maykuth, asked him to sit because standing was not permitted right outside the cockpit. Ginena, who was in his 60s, explained that he needed to stretch periodically because back and circulation problems made protracted sitting extremely painful. Maykuth said he could stand at the rear of the first class cabin, near the partition between first class and coach.
Ginena moved to that location, but soon after the third flight attendant, Robin Duus, came up from coach and ordered Ginena to sit down, using what Shealy described as “an unpleasant loud voice.”[1] Shealy Declaration at ¶ 6. According to Shealy, “[i]t was obvious from body language that [Duus] ... was not in a good mood from the beginning of the flight.” Id. at ¶ 5. “[S]he had been glaring at [the Egyptian] group every time she passed through the first class cabin. She wasn’t looking at me like that.” Id. at ¶ 6. Duus claims that at the beginning of the flight Reda Ginena made “a put down to [my] intelligence and my roll [sic] as an authority figure” by asking a scientific question. Duus refused to answer Ginena’s question because it “wasn’t really pertinent to anything. It was just an interruption.” Duus might also have been upset because, immediately before the flight, the airline had given her a Notice of Discipline or Discharge.
*863 After Duus asked him to sit, Ginena immediately took his seat but Duus continued to hector him: “She wanted to reiterate the fact that he was not supposed to be in the aisle.”[2] Shealy Declaration at ¶ 7. Ginena responded, “I am sitting down,” and Duus “then gave them a piece of paper and insisted that they fill it out. The older gentleman [Ginena] looked shocked.” Id. The form in question was a Customer Inflight Disturbance Report; it was designed to be filled out by flight crew, not passengers.[3] Ginena’s son asked what the form was. According to Ginena, “[Duus] yelled at [my son] to ‘zip it up, end of discussion’ .... ” Ginena Declaration at ¶ 13.
Ginena the elder eventually figured out that the form was actually supposed to be filled out by Duus, and tried to tell her so.[4] In response, Duus “went ballistic and began pacing between the first row and the galley and yelling. She was completely irrational, [Ginena] and his son could not get a word in.” Shealy Declaration at ¶ 7. Shealy also reports that, “[e]ven at the height of the argument the people in row one were respectful to the flight attendant to the extent that they could be under the circumstances.”[5] Id. at ¶ 15. She “saw *864 no sign that any person in the first class section was drunk, nor did [she] observe any misconduct of any kind” on the part of the passengers. Id. at ¶ 3. According to Shealy, the Egyptian passengers “were being accused of something that they clearly did not understand and were being humiliated before the entire aircraft as the flight attendant [Duus] was yelling at the top of her lungs.” Id. at ¶ 8.
Mrs. Ginena then told Duus that she couldn’t treat passengers this way, to which Duus responded “I will show you what I can do to you” and thrust another form into her hands. Ginena Declaration at ¶ 14. Soon afterwards, according to Shealy, “the flight attendant [Duus] said ‘that’s it I’m taking this plane down[.’] All discussion and loud voices stopped. She went and got a phone and was standing for a second in the middle of the aisle by the galley,” and soon thereafter the plane started “a quick descent.” Shealy Declaration at ¶¶ 9-10.
When Duus called the cockpit, she announced that she had “lost control of the first-class cabin.” Swanigan Deposition at 96.[6] Captain Michel Swanigan and First Officer James Roberts asked no questions; neither looked through the cockpit window to see what was going on in the cabin. Instead, Swanigan immediately diverted the plane to Reno, where local police and TSA officials were waiting at the gate. The Reno-Tahoe Airport police then came onto the aircraft and the passengers were disembarked.
Plaintiffs, Swanigan and the flight attendants gave written statements to the police. Plaintiffs protested their innocence but the crew wanted to have plaintiffs arrested. Captain Swanigan was adamant that plaintiffs be taken to jail: “I said [to Flight Attendant Callaway], I want them off the airplane. I want them arrested.... One of [the police officers] said, If you want to press charges, you are going to have to file a report. I said, No problem; I’ll do it.” Swanigan Deposition at 116-20.[7]
Nevertheless, the police and TSA quickly cleared plaintiffs to continue flying. They then asked Swanigan to let them reboard Flight 694 to its destination but Swanigan declined, giving as the reason that “his flight attendant would not allow it.” Rasikh Declaration at ¶ 15. So, with the help of TSA and local police, plaintiffs booked seats on America West. They were allowed to board this flight even though Alaska contacted America West and urged that plaintiffs be denied passage.
After Flight 694 took off, leaving plaintiffs behind, a flight attendant announced to the remaining passengers that plaintiffs had interfered with the flight crew and were responsible for the diversion. Following the incident, Alaska issued this *865 statement: “I know many of us feel that we were let down because these people were not arrested and also puzzled and dismayed by the ability these same passengers had as they proceeded to another airline, bought tickets and flew to their original destination. Just in case you are wondering, we did inform the other airline of these people and the incident. One has to question if the system really works.” Alaska Airlines Chief Pilot’s Newsletter, Oct. 2, 2003. Alaska also reported all nine plaintiffs to the Joint Terrorism Task Force.
Plaintiffs suffered serious consequences. Because they had to take a later flight, they missed their scheduled meeting with the manufacturer of natural gas equipment that they had hoped to distribute in Egypt. The meeting was rescheduled but, on the afternoon of the meeting, plaintiffs were collared by the FBI (responding, apparently, to Alaska’s Joint Terrorism Task Force report). Plaintiffs were marched under guard through the public areas of their hotel and questioned at length; they were interrogated about their Muslim faith, mosque affiliations, employment histories and the incident on Alaska Airlines. See Ginena Declaration at ¶ 34. Mug shots were taken before plaintiffs were released. See Mansour Declaration at ¶ 17. As a consequence, they were two hours late for the rescheduled meeting with the Texas manufacturer, and the hoped-for deal was never consummated. See Rasikh Declaration at ¶¶ 29-31. Word of the incident made its way back to Egypt, where a U.S. State Department official mentioned it to one of the plaintiffs. Id. at ¶ 32.
Proceedings Below
Plaintiffs sued Alaska Airlines alleging damages due to delay under Article 19 of the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 (“Warsaw Convention”), and a variety of state-law defamation and intentional infliction of emotional distress claims.
The district court eventually granted Alaska’s motion to dismiss plaintiffs’ state-law claims as preempted by the Warsaw Convention. Plaintiffs sought leave to file a supplemental complaint under Fed. R.Civ.P. 15(d), alleging seven new defamation claims based on evidence they obtained during discovery. At about the same time, Alaska filed for summary judgment on plaintiffs’ Warsaw Convention claim.
The district court denied plaintiffs leave to file a supplemental complaint, holding both that the motion was improperly brought under Rule 15(d) and that the statute of limitations on their new defamation claims had expired. The district court also granted Alaska’s motion for summary judgment on the Warsaw Convention claim on the ground that the airline was entitled to immunity under the Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 20 U.S.T. 2941, 704 U.N.T.S. 219 (“Tokyo Convention”).
Analysis
I. Original Complaint
A. Warsaw and Tokyo Conventions
In the absence of statute, common carriers such as airlines have the duty “to secure the utmost care and diligence in the performance of their duties,” which means “in regard to passengers, ... the highest degree of carefulness and diligence.” Liverpool & G.W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 440, 9 S.Ct. 469, 32 L.Ed. 788 (1889); see also Andrews v. United Airlines, Inc., 24 F.3d 39, 40 (9th Cir.1994) (explaining that under California law, airlines are “responsible for *866 any, even the slightest, negligence and [are] required to do all that human care, vigilance, and foresight reasonably can do under all the circumstances” (quotation omitted)). When it comes to ejecting passengers from flights, that duty has been modified by federal law. In the case of domestic flights, 49 U.S.C. § 44902(b) grants air carriers immunity if they act reasonably in excluding passengers from a flight. See Newman v. Am. Airlines, Inc., 176 F.3d 1128 (9th Cir.1999); Cordero v. Cia Mexicana De Aviacion, S. A., 681 F.2d 669 (9th Cir.1982).
As to international flights, the common law rule is abrogated by treaty. Any claim by a passenger based on an airline’s conduct during flight, or during the process of boarding or leaving an airplane (embarkation or disembarkation), is limited to three kinds of damages: for bodily injury, for mishandled luggage and for delay; and the maximum amount awarded may not exceed $75,000. See, e.g., Day v. Trans World Airlines, Inc., 528 F.2d 31, 32-33 (2d Cir.1975) (explaining the Warsaw Convention’s basic provisions). Liability is further limited when a passenger’s claim results from actions taken by the pilot or crew to preserve order and safety on board. The Tokyo Convention authorizes pilots to deplane passengers, deliver passengers to law enforcement and forcibly restrain passengers during flight; the airline is immune from any liability if the pilot has “reasonable grounds” to support his actions. As far as we’re aware, this is the first case in the United States, and the second reported opinion anywhere, to interpret the Tokyo Convention, the first being the Zikry case from Israel, which we discuss at length below. See pp. 867, 868-69 infra.
1. Standard of Care. Alaska and its supporting amici, the Air Transport Association of America and the International Air Transport Association, argue that the airline should not be held liable for its treatment of passengers under the Tokyo Convention unless Captain Swanigan acted in an arbitrary and capricious manner. But the treaty and its drafting history say nothing about “arbitrary and capricious.” The standard the treaty adopts is reasonableness. Article 8 of the Tokyo Convention empowers the captain to disembark anyone “who he has reasonable grounds to believe has committed” an act which “jeopardized good order and discipline on board.” Article 9 empowers a captain to turn passengers over to the police if he has “reasonable grounds to believe” that they have committed a “serious offence according to the penal law of the State of registration of the aircraft.”
“It is well settled that the ‘[interpretation of [a treaty] ... must, of course, begin with the language of the Treaty itself.’ ” Medellin v. Texas, 552 U.S. 491, 518-19, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quotation and citation omitted) (alterations in original). The treaty here clearly provides immunity to the airline only if the pilot has “reasonable grounds” to support his actions. “[W]here the text is clear, as it is here, we have no power to insert an amendment.” Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989).
“Because a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty....” Medellin, 552 U.S. at 507, 128 S.Ct. 1346 (quotation omitted). Here, the drafting history is entirely consistent with the treaty’s plain language. The American delegate to the Tokyo Convention wanted reasonableness to be the standard because it is a familiar term for American judges and juries. When another delegate moved to *867 replace the phrase “reasonable grounds” with “serious grounds,” our delegate objected: “At least in the United States legal system, the phrase ‘serious grounds’ had no significant legal meaning, while, on the other hand, the phrase ‘reasonable grounds’ had a substantial legal significance.” International Conference on Air Law, Vol. 1 (“Minutes”), Doc. 8565-LC.152-1 (1966) at 155. Our delegate went on to explain that:
Within the general concept of United States law, the phrase “reasonable grounds” would give the impression that the aircraft commander would be required to have a substantial basis for his belief, that he could not act on the basis of facts which were inadequate to support his belief to the effect that a person had committed or was about to commit the kind of act under consideration.

Id.

Delegates from other nations expressed similar sentiments. The Dutch delegate, for example, said “there had always been an attempt to keep in sight two objectives: Firstly, the safety of civil aviation, and, secondly, the guarantees for individual freedom. For that reason the word ‘reasonable’ had been introduced.” Id. at 156 (Netherlands Delegate). The negotiators spent considerable time striking a balance between the need of flight commanders to maintain order and the legitimate expectation of passengers that they be treated fairly and with dignity.
President Johnson’s message transmitting the Tokyo Convention to the Senate for ratification and the Senate Report recommending ratification strike the same balance by recognizing that air crews must act reasonably in exercising their authority to deplane passengers. In his message to the Senate, President Johnson wrote that the Convention “provides that only those persons whom the aircraft commander has reasonable grounds to believe have committed, on board his aircraft, an act which is a serious offence can be ‘delivered’ [to the police].” Message from the President of the United States, transmitting The Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Signed at Tokyo on September If, 1968, S. Exec. Rep. 90-L at 8 (Sept. 25, 1968). The Senate Report recommending ratification explains that “if their actions are reasonable and comply with the Convention, each aircraft crew member and passenger, the aircraft owner or operator, and the person for whom the flight is made, all would have legal immunity.” S.Rep. No. 91-1083 (1970), as reprinted in 1970 U.S.C.C.A.N. 3996, 3997.
When interpreting international agreements, we must also consult “the postratification understanding of signatory nations.” Medellin, 552 U.S. at 507, 128 S.Ct. 1346 (quotation omitted). The only other reported case interpreting the Tokyo Convention, the Israeli decision of Zikry v. Air Canada, Civil File No. 1716/05 A (Magistrates Court of Haifa 2006), also required aircrews to act reasonably as a condition for Tokyo immunity. In Zikry, the court held that the key questions were “whether reasonable grounds [existed to support] the suspicion that the Plaintiff had committed an offense on board the aircraft, as well as the question of the reasonableness of the steps taken against him.” Id. § 5.
Finally, our interpretation is consistent with our cases applying the analogous statute for domestic air travel, 49 U.S.C. § 44902(b), which provides that “an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, mimical to safety.” Cordero, our first opinion interpreting section 44902(b)’s predecessor, held that airlines *868 must act reasonably. Highly pertinent to our case, Cordero held that airlines don’t have immunity when they bar passengers from boarding on the basis of “unreasonably or irrationally formed” beliefs. 681 F.2d at 671. That interpretation was reaffirmed seventeen years later by Neuman, which also held that “the decision to refuse passage cannot be unreasonable or irrational.” 176 F.3d at 1131 (citing Cordero, 681 F.2d at 671).
Reasonableness is a well-established and easily-understood standard, one that American courts are accustomed to applying in a wide variety of situations involving the behavior of individuals. “Arbitrary and capricious,” by contrast, is a standard normally applied to actions of government agencies or judicial officers; it is seldom used to judge the conduct of individuals in the real world. Juries determine whether conduct is reasonable many times every day but almost never whether conduct is “arbitrary and capricious.” If “arbitrary and capricious” means something other than “reasonable grounds,” we see no basis for adopting a standard that departs from that specified in the treaty. And, if “arbitrary and capricious” is the same as “reasonable grounds,” using different language to express the same idea can only cause confusion.
We are aware that the First Circuit in Cerqueira v. American Airlines, Inc., 520 F.3d 1 (1st Cir.2008), adopted an “arbitrary or capricious” standard for judging the behavior of airline crews who bar passengers from flying on domestic flights. We decline to follow Cerqueira. To begin with, the court’s discussion of the issue is entirely dicta because the passengers there were excluded from the flight by the police not the airline: “During his conversations with the sky marshals service, systems operations control, and the chief pilot on duty, a state police officer approached [the pilot] and told [him], point blank, ‘These three gentlemen are not traveling with you today. It’s out of your hands.’ ” Id. at 8 (quotation omitted). It is thus unclear why the First Circuit thought it necessary to expound at length on this issue. Moreover, as explained above, Cordero adopts a reasonableness standard and remits the issue to the jury. Cerqueira thus departs from Cordero, even as it purports to follow it. We are bound by Cordero and the language of the Tokyo Convention, not Cerqueira, and therefore conclude that airlines are immune. from liability for conduct covered by the Tokyo Convention only to the extent flight commanders act reasonably in exercising the powers granted to them under the treaty.
2. Summary Judgment. We recently explained that “summary judgment is generally an inappropriate way to decide questions of reasonableness because the jury’s unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment.” Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1157(9th Cir.2009) (quotation omitted). We apply this principle in many areas of law. For example, it is generally inappropriate to grant summary judgment on the reasonableness of police conduct, see, e.g., Howell v. Polk, 532 F.3d 1025, 1027(9th Cir.2008) (per curiam) (“[W]e frequently entrust juries with the task of determining the reasonableness of police conduct.”), or when applying state tort law, see, e.g., Wallis v. Spencer, 202 F.3d 1126, 1144 (9th Cir.2000) (“[W]hether there was reasonable cause for the removal of Lauren and Jessie from their home is a question of fact for the jury; so ... the City is not entitled to summary judgment. ...”).
Zikry, the Israeli case, applies this general principle to the Tokyo Convention. The Zikry court held that reasonableness *869 had to be determined as a matter of fact, not law. Like Alaska here, Air Canada there sought dismissal of the complaint based on Tokyo Convention immunity, but the court “rejected the application and held that the question whether reasonable grounds to the suspicion [sic] that the Plaintiff had committed an offense on board the aircraft, as well as the question of the reasonableness of the steps taken against him, require[d] factual clarifications and presentation of evidence.” Zikry § 5 (reciting its earlier order dated September 27, 2005).
Cordero and Newman are also crystal clear that reasonableness is a jury question. Cordero held that “it is peculiarly within the province of the trier of fact to determine whether the defendant’s conduct was reasonable.” 681 F.2d at 672. Judgment as a matter of law was inappropriate, we held, because there was “ample evidence in the trial record from which the jury might have concluded that [the captain] acted unreasonably in excluding Cordero without even the most cursory inquiry into the complaint against him.” Id. Newman is no different. There the district court granted summary judgment in favor of the airline but we reversed, relying on Cordero to hold that reasonableness must be resolved at trial. Newman, 176 F.3d at 1132.
As in Zikry, Cordero and Newman, viewing the evidence in the light most favorable to the plaintiffs, a fact finder here could conclude that Captain Swanigan did not have reasonable grounds to believe that plaintiffs posed a threat to the security or order of the aircraft. To begin with, plaintiffs presented evidence that Swanigan didn’t have reasonable grounds for diverting the plane to Reno. He made the decision to divert after one of the flight attendants called the cockpit and reported that “she had lost control of the first class cabin.” Mansour Declaration at ¶ 6; see also Swanigan Deposition at 96 (“[She said] I’ve lost control of the first-class cabin.”). Swanigan asked no questions and did nothing else to confirm or clarify this statement. Neither he nor his co-pilot looked into the cabin through the cockpit window which, as plaintiffs’ expert witness Captain Mark Swint[8] explained, is a “thick acrylic window” that “is significantly larger tha[n] the common ‘peep hole’ of the average hotel room ... provides a significantly clearer view ... is mounted in the door ... within arm’s reach of the pilots when seated” and is “designed to give the pilots an adequate idea of the circumstances on the other side of the door.” Swint Declaration atlffl 47, 48.[9] Indeed, immediately after landing, Captain Swanigan told one of the flight attendants that he “ha[d] no idea what went on back there.” Swanigan Deposition at 115. A jury could conclude that a reasonable captain should have tried to find out some *870 thing about what was going on in the cabin before undertaking an emergency landing.
Swanigan claims that he and the co-pilot heard shouting in the background when he spoke with the flight attendant, which confirmed that there was chaos in the cabin. Swanigan Deposition at 97. But this claim is contested by plaintiffs and Shealy who report that the passengers had fallen silent by the time the flight attendant called the cockpit. See Shealy Declaration at ¶ 9 (“All discussion and loud voices stopped. [Duus] went and got a phone....”); Mansour Declaration at ¶ 6 (“Everyone was sitting and no one but the flight attendant was speaking.”); Ginena Declaration at ¶ 16 (“At all times while the flight attendant was yelling no one else was yelling or speaking as loud.”). As expert witness Captain Swint said in his declaration, “it is difficult to understand how Captain Swanigan could have allowed this event to escalate to the level that it did without ever asking anything about it.... Actions taken in haste and without an understanding of the pertinent facts are unreasonable and in some cases even dangerous.” Swint Declaration at ¶¶ 46, 55.[10] A jury could reasonably accept this conclusion after hearing all the evidence.
Even if the jury were to find that Captain Swanigan had reasonable grounds to divert the plane to Reno, it could well conclude that he did not act reasonably once the plane was on the ground. At the time Swanigan landed the plane he had no direet information about what had happened in the cabin. He ordered the plaintiffs deplaned and arrested based on his understanding at that time. Jurors could reasonably find that Captain Swanigan should have listened to plaintiffs’ side of the story before forcing them off the plane and turning them over to the police. The plane was on the ground; the cabin was secure; the door to the jetway was open; the police were nearby. The captain could have taken a few minutes to find out for himself why he had been required to divert the plane and make an emergency landing. To assume that the fault lay with the passengers rather than the crew, without making the least inquiry, may not have been reasonable. See Cordero, 681 F.2d at 672.
Indeed, a captain’s failure to investigate a flight attendant’s adverse report about a passenger is precisely what Cordero held was unreasonable. 681 F.2d at 672. The jury there found that the pilot acted unreasonably, but the district court granted judgment notwithstanding the verdict to the airline. Id. at 671. We reversed, holding: “There is ample evidence in the trial record from which the jury might have concluded that [the captain] acted unreasonably in excluding Cordero without even the most cursory inquiry into the complaint against him.” Id. at 672. We see no reason to depart from that sensible holding.
*871 Moreover, while Cordero involved only disembarkation, Swanigan went further by delivering plaintiffs to the police, which requires even stronger support than merely removing a passenger from the plane. Tokyo Convention Article 8 permits “[t]he aircraft commander” to “disembark ... any person who he has reasonable grounds to believe has committed, or is about to commit, on board the aircraft ... act[s]” which “whether or not they are offences, may or do jeopardize the safety of the aircraft or of persons or property therein or which jeopardize good order and discipline on board.” (Emphasis added.) Tokyo Convention Article 9, by contrast, only permits the flight commander to “deliver to the competent authorities ... any person who he has reasonable grounds to believe has committed on board the aircraft an act which, in his opinion, is a serious offence according to the penal law of the State of registration of the aircraft.” (Emphasis added.)[11]
According to Alaska, Captain Swanigan believed plaintiffs’ conduct violated 49 U.S.C. § 46504 (interference with flight crew members and attendants). But the statute is violated only if the interference is accomplished “by assaulting or intimidating a flight crew member or flight attendant.” Viewing plaintiffs’ version of the facts, they did absolutely nothing that anyone could reasonably believe was criminal. None of the passengers made threats or got physical with the flight attendants. Even the story told by the flight crew at the time of the incident does not disclose any action on plaintiffs’ part that could amount to a crime.[12]
In his police report, Captain Swanigan described the situation as follows: “Was advised by cabin crew that passengers were congregating near the Flight Deck Door and they would not stop doing it when ordered. She said things were getting out of hand.” Swanigan Police Report. Simple disobedience or sluggish compliance with directions is not the same as “assaulting” or “intimidating” a flight attendant. And “things were getting out of hand,” does not suggest criminal conduct. A flight commander is required to know a good deal more before turning passengers over to the police.
As an officer charged with enforcing the statute as to passengers aboard his aircraft, Captain Swanigan had to familiarize himself with its terms. See, e.g., United States v. Song Ja Cha, 597 F.3d 995, 1005 (9th Cir.2010) (“The Guam police department’s failure to know the governing law was reckless behavior; the police officers were a far stretch from Leon’s ‘reasonably well trained officer.’ ” (quoting United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984))). A jury could plausibly conclude that Swanigan lacked reasonable grounds to believe plaintiffs had committed a “serious offence,” first because he unreasonably failed to confirm his flight attendant’s story, and second, because he had no grounds for *872 believing that plaintiffs had violated 49 U.S.C. § 46504, even accepting everything the flight attendants told him. Indeed, the jury could simply accept the expert testimony of Captain Swint that Swanigan “had no reason or evidence to believe that all nine passengers were equally culpable of whatever offence he assumed had been committed.... It is my opinion, that it was impossible for Captain Swanigan to have had reasonable grounds to believe, due to his lack of inquiry and willingness to provide leadership in this event, that any offence was being or about to be committed by any passenger.” Swint Declaration at ¶¶ 65, 67.
A jury could also conclude that, even if Captain Swanigan initially had grounds to believe that plaintiffs were disruptive or may have committed a serious offense, those grounds dissipated once the Reno police and TSA exonerated plaintiffs and cleared them to continue flying. Further, when some of the plaintiffs asked Swanigan to let them re-board the airplane, he refused on the grounds that “his flight attendant would not allow it.” Rasikh Declaration at ¶ 15. Based on this evidence, a jury might well conclude that Captain Swanigan’s refusal to let the Egyptians continue on to their destination had nothing to do with safety or order but was designed to placate a flight attendant who had taken a dislike to certain passengers, perhaps because of their nationality or ethnicity. See Cerqueira, 520 F.3d at 24 (Lipez, J., dissenting from the denial of rehearing en banc) (“The SOC manager made a separate decision as to whether the passenger could be rebooked on a flight.... In doing so, he may have relied — perhaps unwittingly — on information tainted by a flight attendant’s racial animus.”)
Finally, Alaska and its supporting amici urge us to affirm the district court on the ground that the captain (or aircraft commander, as he is referred to in the Tokyo Convention) must have very broad discretion in acting to preserve the safety of the plane and its passengers, and must be able to rely on uncorroborated information he received from members of his crew in making command decisions. We certainly agree that the captain must be able to act decisively in an emergency and, in doing so, rely on communications from his crew. A jury may reasonably conclude that there was no emergency here. None of the passengers had made any threats, brandished a weapon or touched a flight attendant. Nor had any of the flight crew informed the captain that any of the passengers had done anything to endanger the plane. Even assuming the truth of everything that Captain Swanigan and his crew now say happened, a jury could conclude that the captain acted unreasonably in diverting the plane to Reno, forcing plaintiffs to disembark, turning them over to the authorities and then refusing to let them re-board the flight after the police had cleared them. We therefore reverse the district court’s grant of summary judgment to Alaska Airlines under the Tokyo Convention and remand for these issues to be resolved at trial.
B. Defamation
1. After the plane landed, Captain Swanigan and members of the crew gave formal statements about the incident to the Reno Police and TSA officials. Plaintiffs claim that these reports were knowingly or recklessly false and filed defamation claims based on them. The district court dismissed those claims pursuant to Warsaw Convention Article 17, which preempts local law remedies for claims if based on conduct that occurs “on board the aircraft or in the course of any of the operations of embarking or disembarking.” El Al Israel Airlines, Ltd. v. Tsui Yuan *873 Tseng, 525 U.S. 155, 172, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (quotation and citation omitted). Plaintiffs claim that the Warsaw Convention does not apply because they had left the plane and thus any actions by the airline fell outside the Convention’s protective umbrella.
In determining whether the accident causing a passenger’s injuries “took place ... in the course of any of the operations of ... disembarking,” we conduct an “assessment of the total circumstances surrounding a passenger’s injuries.... ” Maugnie v. Compagnie Nationale Air France, 549 F.2d 1256, 1257, 1262 (9th Cir.1977). “[T]he Convention drafters did not draw a clear line” for when disembarkation ends, so we have always rejected an “inflexible rule.” Id. at 1262. We have also explained that “[w]hether a passenger is embarking or disembarking is a question of federal law to be decided on the facts of each case.” Schmidkunz v. Scandinavian Airlines Sys., 628 F.2d 1205, 1207 (9th Cir.1980).
In this case, the statements were made in the gate area immediately adjacent to the boarding ramp, shortly after the plane landed. They were made for the sole purpose of transferring custody of plaintiffs from Alaska Airlines to the Reno Police, as authorized by the Tokyo Convention. The Tokyo Convention, moreover, requires flight commanders to provide an explanation to local authorities when they turn over passengers to them. Tokyo Convention Arts. 8(2) & 9(3). It is thus fair to say that the pilot’s statements to the police were part of the disembarkation process. Considering “the total circumstances surrounding [plaintiffs’] injuries, viewed against the background of the intended meaning of Article 17,” Maugnie, 549 F.2d at 1262, we conclude that the crew’s report to the police was covered by the Warsaw Convention. Our conclusion is in accord with Zikry, the only other reported opinion that analyzes the relationship between the Tokyo and Warsaw Conventions. As the Zikry judge explained, “it is obvious that all the events are connected to the flight. The [Warsaw] Convention applies also to embarkation and disembarkation and all the activities following that were links in one chain.” Zikry § 19. We therefore affirm the district court’s dismissal of plaintiffs’ defamation claims based on the statements made in the terminal.
2. Plaintiffs further allege that after Flight 694 took off from Reno to complete the trip to Las Vegas, a member of the crew made an in-flight announcement blaming plaintiffs for causing the diversion. Plaintiffs filed an additional defamation claim for this statement. Like the other defamation claims, the district court dismissed this claim on the pleadings as preempted by the Warsaw Convention.
In supplemental briefing, both the United States and Egypt urge us to reverse this dismissal. Their views deserve serious consideration. See, e.g., El Al Israel Airlines, Ltd., 525 U.S. at 168, 119 S.Ct. 662 (interpreting the Warsaw Convention and explaining that “[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty”); Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (“Because a treaty ratified by the United States is ... an agreement among sovereign powers, we have traditionally considered as aids to its interpretation ... the postratification understanding of the contracting parties.”).
Quoting from Articles 1(1) and 17, the United States in its amicus brief argues that “[t]he Warsaw Convention by its terms applies only to injuries suffered during the ‘international carriage of persons.’ *874 Such carriage ends when ‘the operations of disembarking’ have completed.” Egypt agrees, quoting from Article 17 and explaining that the key question is “whether the passengers were still involved ‘in the course of any of the operations of ... disembarking.’ ”
Both the United States and Egypt argue that the Warsaw Convention’s preemptive effect exists only so long as the plaintiff is still on the airplane, embarking onto the plane or disembarking from the plane. Nothing in the Convention suggests that it extends to lawsuits filed by former passengers for things that happen on planes long after they’ve disembarked. We therefore reverse the district court’s dismissal of plaintiffs’ defamation claim for the post-disembarkation, in-flight announcement.
II. Supplemental Complaint
Plaintiffs sought to add seven new defamation claims based on statements Alaska’s employees made to America West Airlines, to the Joint Terrorism Task Force and in internal newsletters. Alaska stated in internal newsletters that plaintiffs had been “argumentative and abusive,” should have been “arrested” and shouldn’t have been permitted to “proceed! ] to another airline, [buy] tickets and fl[y] to their original destination.” Alaska Airlines Chief Pilot’s Newsletter, Oct. 2, 2003. The newsletters also recounted how Alaska “informfed] the other airline of these people and the incident.” Id. Additionally, Alaska filed a formal report with the Joint Terrorism Task Force in which it reported the entire Egyptian party for causing a “disturbance” in which the captain heard “lots of loud talking, bordering on yelling.” Alaska JTTF Report. Plaintiffs attempted to add defamation claims for these statements by filing a supplemental complaint pursuant to Fed.R.Civ.P. 15(d), rather than by amending their complaint using Fed.R.Civ.P. 15(a). Plaintiffs acknowledge that the acts of defamation underlying these claims occurred between September 29, 2003 and October 3, 2003, and that their original complaint was filed on September 17, 2004. Plaintiffs claim, however, that they did not have the information until it was supplied by defendants in discovery, which itself was late.
Rule 15(d) provides a mechanism for parties to file additional causes of action based on facts that didn’t exist when the original complaint was filed. See, e.g., Cabrera v. City of Huntington Park, 159 F.3d 374, 382 (9th Cir.1998) (per curiam). Plaintiffs, however, seek to add defamation claims arising from conduct which happened nearly a year before they filed their first complaint. These claims could not, therefore, be brought as supplemental pleadings under Rule 15(d). See, e.g., id.-, U.S. for Use of Atkins v. Reiten, 313 F.2d 673, 674 (9th Cir.1963) (“Since the additional allegations in appellant’s ‘amended complaint’ related to events which had ‘happened since the date of the pleading sought to be supplemented,’ Rule 15(d), Federal Rules of Civil Procedure, was applicable.”); William W. Schwarzer et al., California Practice Guide: Federal Civil Procedure Before Trial § 8:1377 (The Rutter Group 2009) (“A pleading may be ‘supplemented’ where the pleader desires to set forth allegations concerning matters which have taken place since the original pleading was filed.”).
The only available mechanism for adding these claims was an amended complaint pursuant to Rule 15(a). But, despite ample warning from the district court, which explained at length that plaintiffs’ claims were not properly brought as supplemental pleadings, plaintiffs insist that these defamation claims were properly filed under Rule 15(d). Their brief presents the issue as simply: “Did the district court *875 improperly deny leave to file a supplemental complaint alleging defamation claims accruing after the original complaint was filed ... ?” The answer is clearly “no” for the reasons explained above. Because plaintiffs don’t make a Rule 15(a) argument, we say nothing on that score. See, e.g., Seven Words LLC v. Network Solutions, 260 F.3d 1089, 1097(9th Cir.2001) (“[It is a] longstanding rule that we do not consider arguments not raised in the briefs.”).
Because we affirm the district court’s denial of the motion as improperly brought under Rule 15(d), we needn’t reach the question of whether Nevada’s discovery rule tolled the statute of limitations. We leave the question of whether plaintiffs may now file a Rule 15(a) motion for leave to amend their complaint for the district judge to decide in the first instance.[13]
We are mindful of the claims of Alaska Airlines and its supporting amici that flight commanders must be given wide latitude in making decisions to preserve safety and orderly conduct aboard an aircraft in flight. But passengers also have a legitimate interest in being treated fairly and with dignity; they are, after all, captives of the airline for the duration of the flight, and may be stranded far from home if not allowed to continue on the flight they have paid for. Moreover, air crews have both de facto and de jure law enforcement authority when the plane is in the air.
These concerns are particularly acute in international flights where passengers may be stranded not only far from home, but confronting police in a foreign country. The Tokyo Convention negotiators worried about this possibility and deliberately chose not to give flight crews unfettered discretion to deplane passengers and turn them over to authorities; rather, they insisted that flight crews act reasonably in doing so. Treating foreign passengers fairly when they are mistreated by our airlines will make it more likely that Americans traveling abroad will be treated fairly by foreign airlines and the foreign authorities where they land.
The record contains substantial evidence that would support a jury’s finding that Captain Swanigan and his crew acted unreasonably toward the plaintiffs. We reverse the grant of summary judgment on plaintiffs’ delay claims and remand them for trial along with their defamation claim for the in-flight announcement after the plane took off from Reno. We affirm the dismissal of plaintiffs’ defamation claims for the statements made on the ground and the district court’s denial of plaintiffs’ motion to supplement their complaint.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

. As Ginena describes it: "Suddenly another flight attendant was speaking to me and very harshly told me to sit down immediately. She said that I had been asked to sit by her colleague and I had ignored her. I replied that her colleague had indeed told me that I could stand at that location. She again ordered me to sit down in a loud firm voice.” Ginena Declaration at ¶ 11.

. Ginena recalls: “As I walked she was behind me and was still talking at me. I do not remember what she was saying but her tone was nasty.” Ginena Declaration at ¶ 11.

. Alaska Airlines’s Flight Attendant Manual calls for notification of the captain and his concurrence before a written notification may be given to a passenger. The flight attendants on Flight 694 did not do this, handing out the forms on their own. The manual also explains that only the bottom part of the form, which consists of a pre-printed notice, is to be given to the passengers. The top portion — the one with all the blanks for names, times, witnesses, etc. — is to be retained by the flight attendant and filled out by the crew. There is nothing in the manual or elsewhere that requires passengers to fill out anything.

. This is Ginena's account:
By that time I had reviewed the form. It had no place for a passenger’s statement or signature. It is to be filled out by the flight attendant and the captain, not by a passenger. I told [Duus] that I was not to fill out or sign that form. At that she began to yell at me. She told me that I was in violation of federal law and would go to jail. She became absolutely irrational and I simply could not follow what she was saying. She was literally screaming at me. My wife then told her that she could not talk to passengers that way and that we could not understand what she was trying to tell us when she was screaming. The flight attendant screamed at my wife pointing her finger at her telling her "I will show you what I can do to you” or words to that effect. The flight attendant walked to the galley and immediately came back and presented my wife with the same form, shouting that she also fill it out and sign it, adding that she will see to it that we all go to jail. She then walked a few feet to the bulkhead by the exit door and picked up a phone which was there. She literally screamed into the phone that she had lost control of the first class cabin and that the aircraft had to be landed immediately.
Ginena Declaration at ¶ 14.

.Plaintiffs fully corroborate this observation. Ginena explained:
At all times while the flight attendant was yelling no one else was yelling or speaking as loud. Indeed, only my wife even attempted to make herself heard over the flight attendant’s yelling but she gave up quickly. I gave up when she began to yell as it was clear to me that she was irrational and that effective communication was impossible. My son also said nothing to Ms. Duus after telling me not to sign anything immediately after receiving his own copy of the customer disturbance form.
Ginena Declaration at ¶ 16. Same for M. Samir Mansour:
Sometime later I awoke to shouting. It turned out to be a flight attendant who was on a phone standing by the door of the galley ahead of the first class section. She was telling someone on the other end of the phone line to land the aircraft as she had lost control of the first class cabin. I could see the entire first class cabin as I was in *864 row three of the three-row section. Everyone was sitting and no one but the flight attendant was speaking.
Mansour Declaration at ¶ 6. And Magdy Rasikh:
As my seat-mate, a young lady from Las Vegas who was unknown to me prior to that flight, says in her declaration, the three members of my party involved at all were simply attempting to respond to the flight attendant who, according to Ms. Shealy, was "going ballistic” and was acting in a completely irrational manner. I am unfamiliar with the term "going ballistic,” but the flight attendant was yelling and irrational.
Rasikh Declaration at ¶ 12.

. There is a dispute as to which flight attendant called the cockpit, with the passengers (including Shealy) saying it was Duus, and the airline crew insisting it was Callaway.

. The police report confirms this: "SWANI-GAN stated that he wanted the involved passengers deplaned and charged with Interfering with a flight crew.” Reno/Tahoe Airport Police Report.

. Captain Mark Swint has been flying for United Airlines for over two decades. He has 35 years of experience in the airline industry, including as an Interview Captain and Line Check Airman for United Airlines. He was the subject of a United training video that focused on his handling of a real in-flight emergency that arose during one of his flights. Swint Declaration at V 13.

. Amicus the International Air Line Pilots Association attempts to explain in its brief that it was impractical or impossible for either the pilot or co-pilot to look through the cockpit window. But these facts are not in the record and plaintiffs have not had the opportunity to challenge them. Captain Swint also explains in his declaration that "[i]t is a simple matter to stand up, turn around taking no more than one step and look through the port. The entire process takes less than 5 seconds.” Swint Declaration at ¶ 48. There is thus at least a dispute as to how a reasonable captain would have responded in the circumstances.

. Captain Swint also faults Captain Swanigan and the Alaska flight crew for failing to adhere to the principles of Crew Resource Management (CRM). CRM provides guidance on how the crew should communicate with each other and deal with problems; it is mandated by the FAA. See FAA Advisory Circular 120-5IE (January 22, 2004). CRM's emphasis on clear communications and coordination among crew members is at the heart of the FAA’s Advisory Circular: "The importance of clear and unambiguous communication must be stressed in all training activities involving pilots, flight attendants, and aircraft dispatchers. The greater one’s concern in flight-related matters, the greater is the need for clear communication.” Id. at ¶ 12a. Captain Swint points out that the crew of Alaska Airlines Flight 694 failed to follow these principles, so the flight commander had no idea what the problem was in his cabin and decided to divert the plane to Reno with insufficient knowledge of the situation.

. See also Minutes at 184 ("[I]t was necessary to draw a distinction between ... disembarkation ... and ... delivery.... In the latter case there was a presumption that the individual was not free to go where he wished. He could not be delivered to authorities unless he was under some form of restraint. This was not necessarily true in the case of disembarkation ... [where] the individual was not, at that time, under any form of restraint.”).

. Long after the incident, in a deposition, one of the flight attendants claimed that both of the passengers to receive Customer Inflight Disturbance Report forms tore or wadded them up and threw them at her. Callaway Deposition at 140-44. That report is not only contradicted by Shealy and the plaintiffs, but by the form itself which one of the plaintiffs produced intact.

. We do note that under Nevada law, the question of whether plaintiffs were diligent and the delay was caused by Alaska — thereby tolling the statute of limitations — is a factual one that is sufficiently contested in this case that it must be decided by a jury. See, e.g., Nev. Power Co. v. Monsanto Co., 955 F.2d 1304, 1307 (9th Cir.1992) (“[Diligence] may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct.”).